

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 1, 2022

**BY ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Sakoya Blackwood*, 22 Cr. 460 (JMF)

Dear Judge Furman:

      The Government respectfully submits this letter in support of its appeal from Magistrate Judge Willis's order granting pretrial release to defendant Sakoya Blackwood, a/k/a "Koya Blackwood Fews," a/k/a "Lila Cohen" ("the defendant") in the above-captioned case.

      This defendant presents an extreme flight risk. The crimes charged in this case arise from a sophisticated extortion and catfishing scheme that the defendant conducted using numerous identities, phone numbers, online accounts, and devices. Given the sophistication and technical acumen exhibited in the scheme, as well as the ease with which the defendant adopted a variety of different identities, there is every reason to believe that the defendant has the skills to flee and evade detection. Moreover, the strength of the evidence in this case, which includes a variety of electronic evidence tying the defendant to the charged catfishing and extortion scheme, and which exposes the defendant to a maximum of 27 years in prison, creates a strong incentive for the defendant to use those skills to flee now. That flight risk is only confirmed by evidence found at the defendant's residence at the time of her arrest. Law enforcement officers recovered approximately six fake identification documents, several of which were in the defendant's wallet. If she is released, there is nothing to stop her from fleeing under one of the many aliases she has – or under a new name, given her demonstrated ability to acquire false documentation. Indeed, the defendant has already exhibited a lack of candor to Pretrial Services—an arm of this Court—about her own whereabouts and recent activities, demonstrating a willingness to deceive the Court to suit her own aims. The defendant has no history of lawful employment, no legal immigration status in this country, and the evidence against her is substantial. She should be detained pending trial.

      On August 30, 2022, the grand jury returned a sealed three-count indictment against Blackwood, charging her with making interstate communications with intent to extort, one count of cyberstalking, and one count of extortion. *See United States v. Sakoya Blackwood*, 22 Cr. 460 (JMF) (the "Indictment"). On August 31, 2022, Blackwood was arrested and the Indictment unsealed. Also on August 31, 2022, Blackwood was presented before Magistrate Judge Jennifer Willis, and ordered the defendant released on conditions, including: (i) a bond in the amount of

$75,000 with two co-signers, including the defendant's mother for moral suasion and one financially responsible person, (ii) home detention with GPS monitoring, and (iii) no possession or use of internet-capable devices. The Government sought a stay in order to appeal that bail determination, which Judge Willis granted. Given the nature of the offense conduct charged in this case, the strength of the evidence, and the defendant's history and characteristics, which include her lack of employment, lack of legal immigration status, possession of multiple false identification documents under a variety of aliases, and possession of exceptional skills at adopting different identities, the defendant poses an extraordinary risk of flight. There are simply no conditions that can ensure her appearance in court.

## Applicable Law

A district court reviews *de novo* a magistrate judge's decision to release or detain a defendant pending trial. *Gotti v. United States*, 358 F. Supp. 2d 280, 283 (S.D.N.Y. 2005); *see also United States v. Leon*, 766 F.2d 77, 80 (2d Cir 1985) ("[A] district court should fully reconsider a magistrate's denial of bail and in ruling on a motion for revocation or amendment of a detention order should not simply defer to the judgment of the magistrate, but reach its own independent conclusion.").

Under the Bail Reform Act, the Government ultimately bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can address those risks. *See* 18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

In assessing a defendant's risk of flight and the danger to the community presented by release, Congress directed courts to consider several factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> > (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C § 3142(g). A defendant is to be detained if no condition or combination of conditions "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B).

"Because the 'rules concerning admissibility of evidence in criminal trials do not apply' to bail hearings, *see* 18 U.S.C. § 3142(f)(2)(B), the parties may proceed by way of proffer, *United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000). As such, courts often base detention decisions on hearsay evidence. *United States v. Boustani*, 356 F. Supp. 3d 246, 251 (E.D.N.Y. 2019), *aff'd*, No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019).

**Discussion**

All three of the relevant factors weigh heavily in favor of concluding that the defendant poses a significant risk of flight. Her offense conduct reflects an unusual ability to adopt multiple identities and evade detection, the evidence of her crimes is strong, and her background—including her lack of candor in connection with this very case—reflects limited ties to the community and a definite ability to flee and evade detection. Given those factors, there are no conditions or combination of conditions that can ensure her appearance in court.

*First*, the defendant's criminal conduct required exceptional skills in crafting new identities and avoiding detection. Since approximately April 2022, the Federal Bureau of Investigation ("FBI") has been conducting an investigation into an extortion and catfishing scheme perpetrated against the Chief Executive Officer of a publicly traded company, identified in the Indictment as Victim-1. That investigation revealed that the defendant used multiple fictitious identities to threaten and harass Victim-1 over the course of multiple months. She adopted at least four different identities to use in the catfishing scheme, through which identities she elicited potentially embarrassing material, made threats, and harassed Victim-1. The accounts and phone numbers that she used to carry out this catfishing scheme masked her involvement; in particular, she used other false names in registering and verifying the accounts. The Government's investigation revealed that the defendant's scheme was broader than her communications with Victim-1. The defendant targeted numerous other potential victims—all wealthy and high profile men—using fictitious identities, while camouflaging her ownership of the accounts deployed in her catfishing scheme.

The defendant's scheme involved a substantial amount of deception and sophistication to perpetrate. Among other things, the defendant created multiple fake identities, using different online accounts, phone numbers, email addresses, and photographs, all crafted to insulate the defendant from being identified as the owner and operator of each account. She used numerous devices to communicate with her potential victims, further distancing herself from the scheme.

Page 4

Most relevant here, that the defendant had the technical acumen to carry out this scheme illustrates that she also has the ability to use those skills flee and evade detection.

*Second*, through extensive investigative work, including the execution of multiple warrants and other investigative techniques, the Government has gathered strong evidence confirming that the defendant perpetrated the scheme charged in the Indictment. Most notably, all four identities that the defendant used to contact Victim-1 through Internet-provided phone numbers connected to the Internet through an IP address that was assigned to the defendant's residence in the Bronx. Moreover, the various accounts underlying those four identities had additional links to online accounts in the defendant's actual name. The defendant also participated in a social media group that discussed stock prices, including the prices for the company where Victim-1 is the CEO. The evidence connecting the defendant to these accounts establishes that she sent the threatening and extortionate messages to Victim-1, and that she targeted other wealthy and high-profile men as part of her catfishing scheme.

*Third*, the defendant's history and characteristics demonstrate that she has both the ability to flee without being detected and a willingness to deceive the Court. The Government executed a search warrant at the defendant's residence yesterday, August 31, 2022. In the course of that search, the Government found numerous false identifications, including driver's licenses with the defendant's photograph and various aliases. *See* Exhibit A. In her wallet, the defendant carried an Arizona driver's license in the name of Louren Hennessy with her own picture, a California driver's license in the name of Susannah Forest with her own picture, an Arizona driver's license in the name of Harper Dean with her own picture, and a New York City identification card in her own name. (Her New York City identification card lists a Brooklyn address – which is an address that the defendant appears to have made no mention of when asked by Pre-Trial Services about prior addresses.)

Agents also recovered still other identification documents and credentials in the defendant's residence, including a hospital badge in the name of Jessica Bottomley, M.D., and a New York State identification in the name of Nataya Romeo. (It is not clear whether those photographs depict Blackwood or someone who resembles her.) In addition to finding these false identification documents, agents also recovered mail in the defendant's home addressed to some of these aliases, including Harper Dean and Nataya Romeo, and addressed to other names that the Government believes to be additional aliases. (During their search, agents confirmed that the only residents of the apartment were the defendant, her mother, her brother, and her daughter, none of whom bears the names on those pieces of mail.)

The Government is also aware of still other identities that the defendant regularly uses. For example, the alias listed in the indictment, Lila Cohen, appears in content from the defendant's email account reviewed pursuant to a judicially authorized search warrant. (The defendant confirmed that email account to be hers during her post-arrest interview yesterday.) The defendant appears to use the name Lila Cohen to submit certain job applications, including for nanny positions. She also used the name Lila Cohen in her catfishing scheme, providing the name to a second potential victim when providing that victim with a mailing address. In addition, the defendant appears to have obtained and deployed the identity of an actual person in her catfishing scheme. Specifically, she registered one of her catfishing accounts in the name of a particular

individual who resides in New York City and has indicated to agents that she was not aware of the account registered in her name.

The defendant's extensive use of fictitious identities, including her demonstrated access to false documents, makes her a unique kind of flight risk. She has resources to flee and avoid capture, and is evidently adept at deploying the very resources that would make it nearly impossible to apprehend her were she to flee.

That is further demonstrated by other evidence accumulated in the Government's investigation. The defendant's regular and casual use of false documents and fictitious identifiers stretches beyond aliases. For example, contents of the defendant's email account, reviewed pursuant to a search warrant, indicates that she has put forward varying credentials and varying educational backgrounds for herself in recent job applications (in addition to submitting some job applications under the name Lila Cohen, as described above). She also regularly provides false addresses in her resumes. The defendant's ability to conjure up identities and backstories further illustrates that she has the sophistication and ability to flee under a false name.

The defendant's representations to Pre-Trial and in the bail argument before Judge Willis also contain inconsistencies that suggest a lack of candor as to her own history. Based on the Pre-Trial report, it appears that the defendant reported to Pre-Trial that she has lived in New York for the last ten years. However, that report conflicts with records from law enforcement databases that show the defendant applied for a California driver's license in approximately the fall of 2017, with a Los Angeles mailing address. She also provided or recalled only two Bronx addresses to Pretrial Services, omitting the Brooklyn address that was on the NYC identification card in her own name carried in her wallet – suggesting either that the address was fictitious or that she declined to provide an address that she had to be aware of. Additionally, defense counsel represented on behalf of the defendant that, at least in part, her relocation out of New York (and her possession of false identifications) may have been linked to a domestic violence situation. However, that representation is in tension with the defendant's statements in her post-arrest interview. The defendant reported to agents that she left New York in order to escape her family and, in particular, an aunt.

The defendant does not have legal status, adding a substantial incentive for her to flee. She arrived from Jamaica on a tourist visa in approximately 2002 and has never left the country, though she may have moved throughout the United States, as suggested by the variety of states from which she has obtained identification cards. Her ties to the area and to the community are similarly insufficient to assure her appearance. The defendant indicated to Pre-Trial Services that, at age 34, she has no employment history whatsoever. Her mother and brother confirmed that she was unemployed. When interviewed by law enforcement agents during the search, both the defendant's mother and brother indicated, in substance, that they were unaware of how the defendant earned money. Nevertheless, the defendant reported to Pre-Trial that she has approximately $7,000 in savings. She indicated to Pre-Trial that she received support from the father of her child, but during her post-arrest interview, suggested that the money in savings came from various "things" that she could not identify.

Given all of these facts, the defendant's family ties are simply not enough to ensure her appearance. The evidence demonstrates that she carried out much of the offense conduct from the apartment where she resides with her mother, brother, and daughter. In other words, her family ties have not deterred her from significant criminal activity. She regularly used a router and an internet connection in her brother's name, possessed numerous fake identifications, and even received mail directed to her various aliases. Nevertheless, her family members were apparently unaware of her activities – suggesting that there is a distance with her family members that rebuts the argument that those relationships will suffice to ensure her appearance.

Home detention and GPS monitoring are simply not sufficient to assure this defendant's appearance given that the defendant has substantial incentives to flee, the sophistication to assume and revise her identity and backstory, the ability to obtain false documentation, and the acumen to evade detection. Multiple defendants in this District have cut their ankle monitors off and fled in recent years. There is nothing to stop this defendant from doing the same, and her sophisticated ability to adopt other identities and use them to carry out criminal activities will enable her to evade detection upon fleeing. Given the nature of the offense, the weight of the evidence, including the materials recovered from the defendant's home, and the individual characteristics of this defendant, the flight risk here is simply too great to permit pretrial release in this case.

## Conclusion

For the foregoing reasons, the Government respectfully submits that there are no conditions that can ensure the defendant's appearance in court, and the defendant should therefore be detained pending trial.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:  \_/s/ Mollie Bracewell_____
Mollie Bracewell
Assistant United States Attorney
(212) 637-2218

cc: Marne Lenox, Esq.