UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
UNITED STATES OF AMERICA,               :
                                        :
        - v. -                          :        22 Cr. 460 (JMF)
                                        :
SAKOYA BLACKWOOD,                       :
                                        :
        Defendant.                      :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTIONS**


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007
*Attorney for the United States of America*


Mollie Bracewell
Justin Rodriguez
Assistant United States Attorneys
        *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................. 1

    A.   Offense Conduct and Investigation................................................. 1

    B.   Challenged Warrants................................................................. 3

ARGUMENT ................................................................................... 4

   I.   THE FACEBOOK WARRANT WAS SUPPORTED BY PROBABLE CAUSE, NOT OVERBROAD, AND RELIED ON IN GOOD FAITH ................................... 4

    A.   Applicable Law ...................................................................... 4

        1.   Probable Cause................................................................. 4

        2.   Particularity ................................................................... 5

        3.   Overbreadth ................................................................... 6

        4.   Good Faith Exception to the Exclusionary Rule............................ 7

    B.   Discussion ............................................................................ 9

        1.   The Facebook Warrant was Supported by Probable Cause ............... 9

        2.   The Warrant was Sufficiently Particularized and Not Overbroad ........ 12

        3.   Agents Relied in Good Faith on the Facebook Warrant ................... 14

        4.   The Facebook Warrant did not Taint the Second Premises Warrant ...... 15

   II.   COUNT ONE AND COUNT THREE SUFFICIENTLY ALLEGE EXTORTION........ 16

    A.   Applicable Law ...................................................................... 16

    B.   Discussion ............................................................................ 18

   III.   COUNT TWO DOES NOT VIOLATE THE FIRST AMENDMENT. ..................... 21

    A.   Section 2261a Does Not Violate the First Amendment on its Face ............ 21

        1.   Applicable Law ............................................................... 21

        2.   Discussion .................................................................... 22

    B.   Section 2261a Does Not Violate the First Amendment as Applied Here.................... 22

        1.   Applicable Law ............................................................... 22

        2.   Discussion .................................................................... 23

   IV.   THE CYBERSTALKING STATUTE IS NOT UNCONSTITUTIONALLY "VAGUE." ................................................................................. 26

    A.   Applicable Law ...................................................................... 27

    B.   Discussion ............................................................................ 28

CONCLUSION ................................................................................ 30

# **TABLE OF AUTHORITIES**

Cases

*Hamling v. United States*, 418 U.S. 87, 117 (1974)................................................................ 16

*Dennis v. United States*, 341 U.S. 494, 503 (1951) ................................................................ 22

*Beauharnais v. Illinois*, 343 U.S. 250, 254-55 (1952)............................................................ 23

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952)............................................. 17

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952).............................. 17

*Chandok v. Klessig*, 648 F. Supp. 2d 449, 456 (N.D.N.Y. 2009)........................................... 25

*Costello v. United States*, 350 U.S. 359 (1956) ..................................................................... 16

*Costello v. United States*, 350 U.S. 359, 363 (1956) .............................................................. 16

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949).......................................... 23

*Golino v. City of New Haven*, 950 F.2d 864 (2d Cir. 1991) ..................................................... 8

*Groh v. Ramirez*, 540 U.S. 551, 557-59 (2004)........................................................................ 5

*Hamling v. United States*, 418 U.S. 87 (1974).......................................................... 16, 19, 21

*Herring v. United States*, 555 U.S. 135 (2009)......................................................................... 8

*Illinois v. Gates*, 462 U.S. 213, 238 (1983) ............................................................................. 4

*In the Matter of a Warrant for all Content and Other Information Associated with the Email Account xxxxx@gmail.com Maintained at a Premises Controlled by Google, Inc.*, 33 F. Supp. 3d 386 (S.D.N.Y. 2014)........................................................................................... 7, 13

*Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) ................................................................ 27

*New York v. Ferber*, 458 U.S. 747, 769 (1982) ...................................................................... 21

*See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942) ......................................... 22

*Texas v. Brown*, 460 U.S. 730, 742 (1983) .............................................................................. 4

*U.S. Postal Service v. C.E.C. Services*, 869 F.2d 184, 187 (2d Cir. 1989).............................. 6

*United States v. Ackell*, 907 F.3d 67, 73 (1st Cir. 2018).......................................................... 22

*United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) ................................................... 17

*United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) ...... 7

*United States v. Blondet*, 16 Cr. 387 (JMF), 2019 WL 5690711, at *3 (S.D.N.Y. Nov. 4, 2019) 16

*United States v. Bout*, No. 08 Cr. 365 (SAS), 2011 WL 2693720, at *5 n.73 (S.D.N.Y. July 11, 2011) ................................................................................................................................ 19

*United States v. Bowker*, 372 F.3d 365, 380 (6th Cir. 2004) ................................................. 28

*United States v. Capo*, 817 F.2d 947 (2d Cir. 1987)............................................................... 18

*United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987)....................................................... 18

*United States v. Cassidy*, 14 F. Supp. 2d 574 (D. Md. 2011) ................................................ 26

*United States v. Conlan*, 786 F.3d 380, 385-86 (5th Cir. 2015) ............................................ 28

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) .................................................... 17

*United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) ............................................ 17

*United States v. Elie*, No. 10 Cr. 33, 2012 WL 383403 (S.D.N.Y. Feb. 7, 2012)....................... 17

*United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.N.Y. Feb. 7, 2012) 17

*United States v. Elson*, 968 F. Supp. 900 (S.D.N.Y. 1997..................................................... 17

*United States v. Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997) ........................................... 17

*United States v. Falso*, 544 F.3d 110 (2d Cir. 2008) ............................................................. 15

*United States v. Farhane*, 634 F.3d 127, 139-40 (2d Cir. 2011) ...................................... 27

*United States v. Fleury*, 20 F.4th 1353, 1362-1363 (11th Cir. 2021) ................................. 22

*United States v. Gagliardi*, 506 F.3d 140, 148 (2d Cir. 2007)........................................... 23

*United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) ............................................... 5

*United States v. Goldberg*, 756 F.2d 949, (2d Cir. 1985) ................................................ 17

*United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985)........................................... 17

*United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016)........................................... 27

*United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999) ............................................... 18, 20

*United States v. Jackson*, 180 F.3d 55, 70 (2d Cir. 1999) ................................................ 18

*United States v. Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) ................................. 6

*United States v. Larson*, 807 F. Supp. 2d 142, 164 (W.D.N.Y. 2011) ......................... 23

*United States v. Leon*, 468 U.S. 897, 914 (1984)............................................................... 5

*United States v. Lustyik*, 57 F. Supp. 3d 213, 227-28 (S.D.N.Y. 2014) ............................ 6

*United States v. Milani*, 739 F. Supp. 216, 218 (S.D.N.Y. 1990)................................... 27

*United States v. Moore*, 968 F.2d 216 (2d Cir. 1992)........................................... 8, 14, 15

*United States v. Murgio*, 209 F. Supp. 3d 698, 706 (S.D.N.Y. 2016) .............................. 19

*United States v. Osinger*, 753 F.3d 939, 944 (9th Cir. 2014) ......................................... 22

*United States v. Petrovic*, 701 F.3d 849, 856 (8th Cir. 2012)......................................... 22

*United States v. Raymonda*, 780 F.3d 105 (2d Cir. 2015) ................................................ 8

*United States v. Redzepagic*, No. 17 Cr. 228 (DRH), 2020 WL 5232066 (E.D.N.Y. Sep. 2, 2020) ........................................................................................................................................ 7

*United States v. Riley*, 906 F.2d 841, 843-45 (2d Cir. 1990) ............................................ 5

*United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) .................................................... 8

*United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010) ........................................................... 8

*United States v. Rosa*, 626 F.3d 56, 58 (2d Cir. 2010) ..................................................... 5

*United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013).............................................. 27

*United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) ........................................... 27

*United States v. Sayer*, 748 F.3d 425, 430, 433-34 (1st Cir. 2014) ............................... 24

*United States v. Shrader*, 675 F.3d 300, 310 (4th Cir.2012) ......................................... 28

*United States v. Stacy*, 802 F. App'x 611 (2d Cir. 2020) ............................................... 15

*United States v. Stokes*, 733 F.3d 438 (2d Cir. 2013) ....................................................... 8

*United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) ............................................... 5

*United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014)6, 7, 12

*United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039, at *14 (S.D.N.Y. Oct. 10, 2014), *aff'd*, 858 F.3d 71 (2d Cir. 2017). .................................................................................. 6

*United States v. Ventresca*, 380 U.S. 102, 108 (1965)...................................................... 5

*United States v. Williams*, 553 U.S. 285, 292 (2008) ..................................................... 21

*United States v. Young*, 745 F.2d 733, 759-60 (2d Cir. 1984)......................................... 6

*Virginia v. Hicks*, 539 U.S. 113, 122 (2003)................................................................... 21

Statutes

18 U.S.C. § 1951 ................................................................................................................. 19

18 U.S.C. § 2261A(2) ......................................................................................................... 25

iv

18 U.S.C. § 875 ................................................................................................ 19, 25, 26

Rules

Fed. R. Crim. P. 29 ............................................................................................... 18
Fed. R. Crim. P. 7(c) ............................................................................................ 18
*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) ................................... 18, 20

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum in law in opposition to defendant Sakoya Blackwood's motions to suppress certain evidence and to dismiss all counts of the Indictment.  For the reasons that follow, the Court should deny the motions in their entirety.

**BACKGROUND**

**A.  Offense Conduct and Investigation**

This case arises from a months-long investigation conducted by the Federal Bureau of Investigation ("FBI") into a plot to extort the CEO of a publicly traded company ("Victim-1").  In or about March of 2022, Victim-1 began to receive text messages from someone identifying herself as "Mia."  Over the course of weeks, "Mia" engaged in sexually explicit communications with Victim-1 and elicited sexually explicit photographs.

Victim-1 then began receiving other communications from individuals purporting to be associated with "Mia" or to be aware of Victim-1's communications with "Mia."  Beginning in or about April of 2022, Victim-1 started to receive text messages from someone identifying himself as "Brian," in which "Brian" claimed to have seen Victim-1's exchange with Mia and threatened to release the sexually explicit materials about Victim-1.  Victim-1 received Twitter communications also purportedly from "Brian," obliquely referencing, among other things, Victim-1's exchange with "Mia" and potential public exposure.  Victim-1 received text messages from "Mia" using a second phone number that she claimed was her friend's phone (the "Mia Friend Phone").  Also in April of 2022, Victim-1 received text messages from someone identifying as a media agency employee and shareholder of Victim-1's company (the "Shareholder") who claimed that his employer media agency had received a tip that damaging information about Victim-1 was being sold for $250,000 and articulating concern, as a supposed shareholder, that the information

1

would cause an adverse reaction.  In or about June of 2022, Victim-1 received text messages from someone purporting to be associated with Vanity Fair (the "Vanity Fair Contact"), who described being shown images and text conversations related to an affair.

The Government's investigation commenced in April of 2022 when Victim-1 reported these communications to law enforcement.   In the course of its investigation, the Government was able to connect the various communications to Victim-1 described above back to the defendant. The phone numbers used in these communications, including by "Mia," "Brian," the Shareholder, the Vanity Fair Contact, and the Mia Friend Phone, were all VOIP numbers associated with online accounts (collectively, the "Extortion Accounts").  Almost all of the Extortion Accounts[1] had activity originating from a particular IP account (the "Target IP Address") assigned to the same physical address where the defendant resided and which was subscribed in the defendant's brother's name.  Through its investigation, the Government also identified personal accounts in the defendant's own name or a variation of it, including a Facebook account and a Google account. The defendant's personal accounts also had activity from the Target IP Address.  The defendant's personal accounts also had a variety of links to certain Extortion Accounts, including that the "Mia" account was "linked by cookies" to the defendant's Google account, that the Mia Friend Phone shared the same advertising identification number with the defendant's Facebook account, and that the Mia Friend Phone showed a display name that appeared to be a variation of Blackwood's own name, mskoya referring to "Ms. Koya."

The defendant was charged in a sealed three-count indictment 22 Cr. 460 (JMF) returned on August 30, 2022.   The defendant was charged in Count One with making interstate

---

[1] The service provider did not furnish IP activity for the account associated with Mia Friend Phone.

communications with intent to extort, in violation of 18 U.S.C. §§ 875(d) and 2, in Count Two with cyberstalking, in violation of 18 U.S.C. §§ 2261A(2)(B) and 2, and in Count Three with extortion, in violation of 18 U.S.C. §§ 1951 and 2. The defendant was arrested on August 31, 2022, and the Indictment was unsealed.

### B.  Challenged Warrants

The defendant's suppression motion challenges two warrants obtained in the course of the investigation. On or about July 8, 2022, the Honorable Valerie Figueredo, United States Magistrate Judge, signed a search warrant (the "Facebook Warrant"), upon an affidavit sworn to by FBI Special Agent Elizabeth Wheeler (the "Facebook Affidavit"), for content from the defendant's Facebook account (the "Blackwood Facebook Account").

On or about August 26, 2022, the Honorable Sarah Cave, United States Magistrate Judge, signed search warrants for two apartments associated with the defendant at 668 East 223rd Street in the Bronx, New York (collectively, the "First Premises Warrants"), upon an affidavit sworn to by FBI Special Agent Elizabeth Wheeler (the "First Premises Affidavit"). As set forth in the First Premises Affidavit, law enforcement officers believed that the defendant was residing in Apartment 1 and using a router connected through Apartment 2. Law enforcement officers obtained a search warrant for Apartment 1, identified as Subject Premises-1, and a narrower search warrant for routers, modems, and network equipment in Apartment 2, identified as Subject Premises-2.

Law enforcement officers went to execute the search warrants on or about August 31, 2022, on the date of the defendant's arrest. On that date, officers determined that the defendant was in fact residing in Apartment 2. As a result, on the morning of August 31, 2022, law enforcement

officers sought a second search warrant for Apartment 2 (the "Second Premises Warrant"), upon an affidavit from Special Agent Wheeler (the "Second Premises Affidavit").

## ARGUMENT

I. **THE FACEBOOK WARRANT WAS SUPPORTED BY PROBABLE CAUSE, NOT OVERBROAD, AND RELIED ON IN GOOD FAITH**

### A. Applicable Law

#### 1. Probable Cause

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The legal standard for determining whether a particular warrant application is supported by probable cause is well established. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).[2] Such determinations must be approached in a practical way, *id.* at 232, because "probable cause is a flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983). Additionally, the training and experience of law enforcement agents bear significantly on probable cause determinations. *Gates*, 462 U.S. at 232. Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances, and their training and experience can all support a probable cause finding. *Id.* at 231-32.

A warrant issued by a neutral and detached magistrate is "entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant." *United States v. Rosa*, 11 F.3d

---

[2] Unless otherwise noted, all citations, quotation marks, and alterations are omitted.

315, 326 (2d Cir. 1993). This is so for at least two reasons. First, as the Supreme Court has observed, "[r]easonable minds frequently may differ on the question whether a particular affidavit established probable cause." *United States v. Leon*, 468 U.S. 897, 914 (1984). Second, "[a] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). For these reasons, the Supreme Court has directed that "courts should not invalidate [a] warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *Id.* at 109.

### 2.  Particularity

To satisfy the particularity requirement, a warrant must: (1) "identify the specific offense for which the police have established probable cause"; (2) "describe the place to be searched"; and (3) "specify the items to be seized by their relation to designated crimes." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (internal quotations omitted). "The Fourth Amendment does not require a perfect description of the data to be searched and seized, however," and "[s]earch warrants covering digital data may contain 'some ambiguity. . . .'" *Id.* (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013)). "A search warrant does not necessarily lack particularity simply because it is broad." *Id.* at 100. Rather, the requirement is satisfied if the warrant, including its attachments, enables the executing officer to ascertain and identify with reasonable certainty those items authorized to be searched and seized. *See Groh v. Ramirez*, 540 U.S. 551, 557-59 (2004); *United States v. Rosa*, 626 F.3d 56, 58 (2d Cir. 2010).

A warrant that calls for seizure of "all evidence" of a given crime or crimes is sufficiently particular if it offers a list of illustrative items. *See United States v. Riley*, 906 F.2d 841, 843-45 (2d Cir. 1990) (warrant containing list of illustrative items to seize was sufficiently particular notwithstanding provision allowing, as well, seizure of "other items that constitute evidence of the

offenses" identified); *United States v. Young*, 745 F.2d 733, 759-60 (2d Cir. 1984) (warrant allowing seizure of listed items plus "other evidence of" the crimes specified was sufficiently particular); *United States v. Lustyik*, 57 F. Supp. 3d 213, 227-28 (S.D.N.Y. 2014) (warrant permitting seizure of all "evidence, fruits, or instrumentalities" of specified crimes was sufficiently particular because it contained "an illustrative list of items to be seized," even though illustrative list was preceded by phrase "including but not limited to"); *United States v. Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants.").

### 3. Overbreadth

The probable cause and particularity requirement intersect in the doctrine of overbreadth. "[A warrant] is defective if it is broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446. Thus, broad language in a search warrant may be justified if the criminal methods are extensive and the criminal activity is pervasive. For example, "[w]hen the criminal activity pervades [an] entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements." *Ulbricht*, 858 F.3d at 102 (quoting *U.S. Postal Service v. C.E.C. Services*, 869 F.2d 184, 187 (2d Cir. 1989)).

In this context, "it is important not to confuse the separate context of the seizure of an item . . . with the search itself." *United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039, at *14 (S.D.N.Y. Oct. 10, 2014), *aff'd*, 858 F.3d 71 (2d Cir. 2017). That is:

> It has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized. For instance, warrants have long allowed searching a house high and low for narcotics—indeed, it is rare that drug dealers point out the hidden trap in the basement—or reviewing an entire file cabinet to find files that serve as evidence of money laundering activity, which might be intermingled with files documenting lawful and irrelevant activity.

6

*Id.*; *accord Riley*, 906 F.2d at 845.

Applying this rationale to the context of electronic evidence, "[c]ourts in this Circuit . . . have uniformly held that law enforcement need not rely upon an email host company or any other private party to sift through emails to determine what is relevant and that it may obtain a warrant to request all emails from an account." *Ray*, 2021 WL 2134861, at *25 (citing *United States v. Redzepagic*, No. 17 Cr. 228 (DRH), 2020 WL 5232066, at *7-10 (E.D.N.Y. Sep. 2, 2020); *Nejad*, 436 F. Supp. 3d at 729; *Ulbricht*, 2014 WL 5090039, at *13-15; *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at *7-8 (S.D.N.Y. Oct. 9, 2020)); *see also In the Matter of a Warrant for all Content and Other Information Associated with the Email Account xxxxx@gmail.com Maintained at a Premises Controlled by Google, Inc.* ("*In re Google Warrant*"), 33 F. Supp. 3d 386, 393 (S.D.N.Y. 2014) ("[W]e view it as well established that a search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government.").

### 4.  Good Faith Exception to the Exclusionary Rule

Under the so-called "good faith" exception, the exclusionary rule and its remedy of suppression does not apply where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Leon*, 468 U.S. at 922.  In announcing this principle, the Supreme Court noted that suppression could have no deterrent effect on law enforcement that acted on the objectively reasonable assumption that their conduct did not violate the Fourth Amendment.  *Id.* at 918-20.  In analyzing the applicability of the good faith exception, the pivotal question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23.  If the reviewing court finds that the

officers' reliance on the warrant was objectively reasonable, suppression is not warranted. *See, e.g.*, *Singh*, 390 F.3d at 183. Moreover, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Exclusion should be a "last resort" rather than a "first impulse." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) (internal quotation marks and citation omitted). The exclusionary rule should be used only where law enforcement "'exhibit[s] deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.'" *United States v. Raymonda*, 780 F.3d 105, 117-18 (2d Cir. 2015) (quoting *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013)).

As a result, "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922 (internal quotation marks and citations omitted); *see also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (noting that the "issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause"). Indeed, the good faith exception does not apply only in four narrow circumstances:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *Leon*, 468 U.S. at 923).

8

### B.  Discussion

#### 1.  The Facebook Warrant was Supported by Probable Cause

The magistrate judge had a "substantial basis," *Gates*, 462 U.S. at 238-39, for concluding that there was probable cause that the Blackwood Facebook Account would contain evidence, fruits, and instrumentalities of the offenses charged in the Indictment.  The defendant asserts the Facebook Warrant was not supported by probable cause because (i) it "provided no affirmation justifying that Ms. Blackwood—as opposed to her mother or brother—should have been the target of the search," and (ii) it did not set forth "probable cause to believe, even if Ms. Blackwood were involved in the communications with Victim-1, that there would be evidence of those communications on her Facebook account." (Def. Mem. at 5-6).  Both arguments are unavailing.

As to the defendant's first argument, the Facebook Affidavit describes, in considerable detail, how law enforcement officers connected the defendant – not just her mother or brother – to the offenses for which evidence was sought (the "Subject Offenses").  The Facebook Affidavit did detail how the various Extortion Accounts had activity from the Target IP Address, for which the defendant's brother or half-brother was the listed subscriber and at a physical address where the defendant's mother had paid utilities bills at the physical address. (*See* Def. Ex. B at ¶¶ 34-37).  The defendant's relatives' connections to the Target IP Address were corroborative of the defendant's involvement and only part of the probable cause showing.

The defendant's brief acknowledges the Facebook Affidavit details two other connections between the defendant and the Extortion Accounts:  One connection was that the account associated with the Mia Friend Phone, had a display name of "mskoya" believed to be a variant of the defendant's known alias, Koya.  (*See* Def. Ex. B at ¶¶ 41, 42).  The second connection was that the account used by "Mia" was "linked by cookies" to an email account in the defendant's own name (the "Blackwood Google Account"), meaning that both had been accessed from the same

9

device.  (*See* Def. Ex. B at ¶ 42).  The defendant's brief dismisses these two connections with the conclusory assertion that they were "insufficient."  However, these connections were neither "insufficient" nor the "only" facts relied upon in the Facebook Affidavit.

As to their sufficiency, the defendant tries to undercut their importance with arguments that do not withstand scrutiny.  For example, the defendant contends that law enforcement officers wrongly believed that the "Mia Friend Phone" belonged to the perpetrator of the scheme rather than a friend of the perpetrator.  (*See* Def. Mem. at 5 ("There was no reason for law enforcement officers to believe that the Mia Friend Phone belonged to the perpetrator; "Mia" explicitly said that it was not her phone, that it was her "friend's phone," and that Victim-1 should not communicate with it.")).  Contrary to the defendant's suggestion otherwise, there was many good reasons to scrutinize and disbelieve the statements being made to extort and harass Victim-1 given that, as set forth in the Facebook Affidavit, law enforcement officers had already determined that "Mia" was a fictitious identity being used to communicate with Victim-1 and with other potential victims.  (*See* Def. Ex. B at ¶¶ 25, 33).   The defendant also concludes that two accounts "linked by cookies" is simply not enough, analogizing the situation to "anonymous criminal activity found in an apartment's walkway or lobby" as the basis for probable cause of searches of individual apartments.  (Def. Mem at. 5-6).  To the contrary, the link is much more direct, suggesting that a single individual, possessing a single device, has the username and password information of two different accounts.  These connections were more than sufficient; they showed that accounts used to extort Victim-1 were directly connected to the defendant in ways that were highly suggestive of ownership and use.  In addition, the defense simply overlooks other facts set forth in the Facebook Affidavit connecting the Extortion Accounts to the defendant, including, for example, that the Blackwood Facebook Account had activity originating from the Target IP Address between

November 2021 and June 2022 (*see* Def. Ex. B at ¶ 43(b)); and that the Blackwood Google Account had a log-in from the Target IP Address in January 2022 (*see id.* at ¶ 42).

The defendant's second argument is, essentially, that the Facebook Affidavit did not establish that any communications between the defendant and Victim-1 would exist on the Blackwood Facebook Account. (Def. Mem. at 6 (describing the Facebook Warrant as "deficient because there is no probable cause to believe, even if Ms. Blackwood were involved in the communications with Victim-1, that there would be evidence of those communications on her Facebook account")). Indeed, communications with Victim-1 or other potential victims were not among the evidence sought or expected to be found on the Blackwood Facebook Account. To the contrary, the Facebook Warrant specifically sought other categories of evidence showing other online accounts or user attribution that were well supported by the Facebook Affidavit.

After detailing how the ongoing extortion scheme involved multiple online accounts being used to communicate with Victim-1, and how the defendant was connected to the extortion scheme and to the Blackwood Facebook Account, Agent Wheeler's affidavit described the types of evidence that, based upon her training, experience, and involvement in this and similar investigations, online accounts often have. (*See* Def. Ex. B at ¶ 44). Agent Wheeler explained how "online accounts used by individuals who participate in crimes such as the Subject Offenses often have information stored therein relating to the requisite infrastructure acquired to execute the crimes - for example, reference to other online accounts that are used." (*See id.* at ¶ 44(a)). Agent Wheeler also described seeking "user attribution evidence" – such as "subscriber information, messaging logs, the content of messages, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time)" to show who was using or controlling the account, analogous to indicia of occupancy evidence during a physical search. (*Id.*

at ¶ 44(b)).  Agent Wheeler explained that such attribution evidence was "particularly important" "given that [the subject offenses] have largely transpired through electronic communications which obscures the identities of the perpetrators." (*Id.*)

The Facebook Affidavit acknowledged that there was limited publicly available content on the Blackwood Facebook Account, but noted that the account's cover photograph was a 2012 photograph of a Rolex watch.  (*See id.* at ¶ 43(d)).   Agent Wheeler, based on her training and experience, described her belief that it was intended to signal the account owner's access to, or ownership of luxury items.  (*Id.*).  The ongoing public display of such a photograph well supported the Facebook Warrant's inclusion of "[e]vidence of proceeds obtained from the Subject Offenses, including but not limited to photographs depicting cash, luxury items, or other expenditures."  (*See* Def. Ex. B at ¶ 46).

## 2.  The Warrant was Sufficiently Particularized and Not Overbroad

In the alternative, the defense argues that the Facebook Warrant was not sufficiently particularized.  The defendant raises two arguments for overbreadth, including that (i) the Facebook Warrant sought categories of information that "bear no logical connection to the criminal activity alleged in the affidavit or encompassed by the offenses described," and (ii) the Facebook Warrant sought information starting from November 1, 2021.  (Def. Mem. at 11).

On the first argument, the defense conflates what information the provider was required to produce and what information was within the scope of the Facebook Warrant.  As noted above, "[i]t has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized."  *Ulbricht*, 2014 WL 5090039, at *14.  This general rule applies with equal force to searches of Facebook accounts.  As discussed above, courts uniformly have held that it is proper for warrants to require the production of the entirety of an account, so that it may

12

reviewed for responsive material.  *See, e.g.*, *In re Google Warrant*, 33 F. Supp. 3d at 393 ("[A] search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government."). The particular categories of information that the defendant argues were overbroad could clearly produce the kind of user attribution information covered by the Facebook Warrant.  (*See* Def. Mem. at 11 n.2 (describing as overbroad categories like "identifying information, other profile information (including likes, notes, friend lists and requests, groups of which the user is a member, event postings, gifts, posts, and tags), associated internet browsers, "fan" pages, Facebook searches, data regarding Facebook Marketplace, data regarding types and length of service, privacy settings, and support logs")).

On the second argument, not only did the Facebook Warrant provide a temporal limit, it provided a distinct temporal limit based on the probable cause in the warrant for the defendant's use of that account.  As set forth in the Facebook Affidavit, the Blackwood Facebook Account reflected a log-in from the Target IP Address on November 10, 2021, and a log-out from the Target IP Address on June 18, 2022.  (Def. Ex. B ¶ 43(b)).  That well supports the time frame in the Facebook Warrant from November 1, 2021 to the present, given Agent Wheeler's belief that the account would contain user attribution information to identify a perpetrator who was purposefully camouflaging her identity in the extortion scheme.   In addition, as made clear in the Facebook Affidavit, law enforcement officers were investigating earlier communications with other potential victims, including with a particular victim ("Victim-2") in January of 2022. (*See* Def. Ex. B ¶ 31, 33).  Given the complex nature of the offense conduct occurring as it did over months, it thus was entirely proper for the time period of the warrant to encompass an expansive time frame that correlated with the offense conduct under investigation. *Jacobson*, 4 F. Supp. 3d at 526 (rejecting

an argument that the warrants in question, which did not contain any temporal limitation, lacked particularity where, as here, the "crimes under investigation were complex and concerned a long period of time, not simply one or two days of criminal activity.").

In any event, the remedy for an overbroad or insufficiently particular warrant is not suppression of all evidence, but only the portion seized pursuant to the overbroad or insufficiently particularized portion of the warrant.  *See, e.g.*, *George*, 975 F.2d at 79 ("When a warrant is severed (or redacted) the constitutionally infirm portion—usually for lack of particularity or probable cause—is separated from the remainder and evidence seized pursuant to that portion is suppressed; evidence seized under the valid portion may be admitted.").  Even if the defendant were therefore correct that certain types of non-content information should not have been seized or that a certain date range was overbroad, the remedy for that alleged violation would be suppression only of those categories or dates.  *See id.*

### 3.  Agents Relied in Good Faith on the Facebook Warrant

Even if the Court determined that the Facebook Warrant was not supported by probable cause—which it was—the evidence seized pursuant to it should not be suppressed because it was relied upon in good faith.

There is no serious suggestion that the agents lacked a good faith belief that the Facebook Warrant was proper and could be relied upon.  As an initial matter, there is no suggestion that the agents misled the issuing judge in any respect whatsoever or that the issuing judge "wholly abandoned his or her judicial role."  *Moore*, 968 F.2d at 222.  There is also no basis to find that the Facebook Affidavit "so lacking in indicia of probable cause as to render reliance upon it unreasonable."  *Id*.  To the contrary, the affidavit was lengthy, thorough, accurate, and approved by a magistrate judge.  *See, e.g.*, *Leon*, 468 F.3d at 921 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination . . . .");  *United States v. Falso*,

544 F.3d 110, 129 (2d Cir. 2008) (declining to hold that agents acted unreasonably in relying on judge's probable cause determination because "the error . . . was committed by the district court in issuing the warrant, not by the officers who executed it").  Finally, the Facebook Warrant was not "so facially deficient" that reliance on it was unreasonable.  *Moore*, 968 F.2d at 222. It outlined the specific crimes of which evidence, fruits, and instrumentalities were sought, and the categories of evidence, tailored to the facts of this case and to the time frame for which there was probable cause.  *See, e.g.*, *United States v. Stacy*, 802 F. App'x 611, 614 (2d Cir. 2020) ("The example of a facially deficient warrant provided by the *Leon* Court is one that does not 'particularize the place to be searched or the things to be seized.'" (quoting *Leon*, 468 U.S. at 923)).

### 4.  The Facebook Warrant did not Taint the Second Premises Warrant

Finally, and in passing, the defendant contends that the "illegally collected Facebook evidence served as the principal evidence in support of the warrant to search Ms. Blackwood's home," and therefore, that evidence from the defendant's home should be suppressed as fruit of the poisonous tree.  (*See* Def. Mem. at 12).  This argument does not withstand even a cursory review of the affidavits underlying the First and Second Premises Warrants.  The Second Premises Affidavit attached the First Premises Affidavit as an exhibit and incorporated its contents.  (*See* Def. Ex. E at ¶7).   The First Premises Affidavit provided a detailed description of the offense conduct (*see* Def. Ex. D at ¶¶7-14), and a detailed description of how the defendant was linked to the offense conduct and to the residence (*see* Def. Ex. D at ¶¶15-18).  The only information derived from the Blackwood Facebook Account was reference to the defendant's membership in a day-trading group in which Victim-1's company had been mentioned by other participants, and the fact of the defendant's Facebook communications with her mother (a relationship which Agent Wheeler had already described in the Facebook Affidavit based on previously obtained records from the NYPD (*see* Def. Ex. B at ¶40)).  In short, the defendant's description of the Facebook

15

evidence as the "principal evidence" supporting the Second Premises Warrant is thoroughly refuted by the underlying affidavit.

## II.   COUNT ONE AND COUNT THREE SUFFICIENTLY ALLEGE EXTORTION.

The defendant argues that the Court should dismiss Count One and Three because "Ms. Blackwood's use of fear of financial injury was not wrongful." (Def. Mot. at 1).  In essence, the defendant admits that she committed the charged conduct.  She claims, however, to have had a good reason for her actions. Ultimately, her argument about the apparent righteousness of her conduct rests on the false premise that Victim-1 had sex with a minor (a claim for which neither the Government nor the defendant has any evidence).  The Government expects that the proof at trial will demonstrate the falsity of the defendant's claims and the wrongfulness of her conduct. For present purposes, however, the defendant's motion to dismiss must fail because the Indictment satisfies the requirements of Rule 7 of the Federal Rules of Criminal Procedure,

### A.  Applicable Law

"A defendant faces a high standard in seeking to dismiss an indictment." *United States v. Blondet*, 16 Cr. 387 (JMF), 2019 WL 5690711, at *3 (S.D.N.Y. Nov. 4, 2019).  It is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits."  *Costello v. United States*, 350 U.S. 359, 363 (1956).  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *see also* Fed. R. Crim. P. 7(c).  To state an offense, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998).

Where, as here, the charging instrument meets those basic requirements, dismissal of an otherwise facially valid indictment is an "extraordinary remedy." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted). In particular, where a motion to dismiss the indictment is, at core, a challenge to the sufficiency or quality of the evidence the Government may adduce at trial to establish the defendant's guilt of the crimes charged, a defendant must wait until after the close of the Government's case-in-chief at trial or after the jury's verdict before contesting the sufficiency of the evidence. *See* Fed. R. Crim. P. 29; *see also, e.g.*, *United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.N.Y. Feb. 7, 2012) ("[T]here is no summary judgment in criminal cases. . . .  [A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence."); *United States v. Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997).  In short, on a pretrial motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, the allegations of the indictment must be taken as true.  *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

The Hobbs Act (charged in Count Three of the Indictment) provides, in relevant part, that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do" shall be guilty of a crime.  18 U.S.C. § 1951(a).  The Hobbs Act further defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." *Id.* § 1951(b)(2).  The Second Circuit has "repeatedly stressed that the element of 'fear' required by the [Hobbs] Act can be satisfied by putting the victim in fear of economic loss." *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987).

17

Similarly, 18 U.S.C. § 875(d) (charged in Count One of the Indictment) prohibits extortion through the use of interstate communications. That statute provides that "[w]hoever, with intent to extort from any person . . . any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee … or any threat to accuse the addressee or any other person of a crime" shall be guilty of a crime.

As the Second Circuit has explained with respect to both provisions, "a threat to cause economic loss [or reputational harm] is not inherently wrongful; it becomes wrongful only when it is used to obtain property to which the threatener is not entitled." *United States v. Jackson*, 180 F.3d 55, 70 (2d Cir. 1999). "Where there is no plausible claim of right and the only leverage to force the payment of money resides in the threat, where actual disclosure would be counterproductive, and where compliance with the threatener's demands provides no assurance against additional demands based on renewed threats of disclosure," the Second Circuit regards a threat to reputation in that context as "inherently wrongful." *Id.* at 71. Accordingly, a threatener may be found guilty of extortion based on a threat of economic or reputational harm where the threatener "seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim of right, or where the threat has no nexus to a plausible claim of right." *Id.* at 71.

### B. Discussion

The defendant does not seriously dispute that the Indictment "contains the elements of the offense charged and fairly informs [her] of the charge against which [s]he must defend, and, second, enables [her] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117. Indeed, the Indictment indisputably contains the elements of

18

the charges and describes the time, place, and circumstances of the offenses. The "to wit" clauses

further provide:

> [With respect to Count One,] BLACKWOOD used multiple online identities to target one or more wealthy and high-profile men in a catfishing and extortion scheme, during which BLACKWOOD threatened to release sexually explicit photographs of, and sexually explicit communications involving, a particular individual who is the Chief Executive Officer of a publicly traded company ("Victim-1") with the intent to extort Victim-1.
>
> ….
>
> [With respect to Count Three,] BLACKWOOD used threats of economic and reputational harm from the release of sexually explicit communications and photographs in an attempt to obtain payments from Victim-1.

Indictment ¶¶ 1, 3. Nothing more is required. *Alfonso*, 143 F.3d at 776.

Nonetheless, the defendant argues that "[t]he conduct alleged in the Indictment was not 'wrongful' because Ms. Blackwood had the right to expose truthful information about Victim-1's misconduct, the right to sell that information to the press, and the right to inform Victim-1." Br. at 8-9. But, on a motion to dismiss, an indictment's allegations must be accepted as true—not a defendant's. *See, e.g., United States v. Murgio*, 209 F. Supp. 3d 698, 706 (S.D.N.Y. 2016) ("In evaluating a motion to dismiss, the Court 'accept[s] as true all of the allegations of the indictment.'" (quoting *Goldberg*, 756 F.2d at 950)). In short, that the defendant may seek to offer alleged alternative facts at trial or argue to the jury that her conduct was not wrongful is immaterial, as she is not entitled to dismissal of a properly returned indictment because she disagrees with its allegations or believes the Government will not be able to meet its burden. *See, e.g., United States v. Bout*, No. 08 Cr. 365 (SAS), 2011 WL 2693720, at *5 n.73 (S.D.N.Y. July 11, 2011) ("To the extent [that the defendant's] challenges are to the sufficiency of the Government's evidence to satisfy—as opposed to the sufficiency of the Indictment to allege—the federal elements of the

19

crimes charged, those arguments are not appropriately decided on a motion to dismiss."), *aff'd*, 731 F.3d 233 (2d Cir 2013).

The defendant relies heavily on the Second Circuit's decision in *Jackson*, but that case does not entitle the defendant to dismissal of Counts One and Three at this early stage. As an initial matter, *Jackson* involved a challenge to a district court's jury instructions on extortion counts at trial, not a motion to dismiss extortion counts from an indictment before trial. *See Jackson*, 180 F.3d at 65-72.

Furthermore, the circumstances here are fully in accord with the requirements of *Jackson* (although again, the Court need not engage with the defendant's arguments to reject her motion). The charged conduct in this case has all the hallmarks of an "inherently wrongful" threat described in *Jackson*: (1) "there is no plausible claim of right," *i.e.*, the defendant has no "contract or promise" or other right to insist on money from Victim-1; (2) "the only leverage to force the payment of money resides in the threat," *i.e.*, the defendant's "threat to disclose was the only leverage she had to extract money from" Victim-1 and "if she sold her story to [the media], she would lose that leverage;" (3) "actual disclosure would be counterproductive," *i.e.*, disclosure of false accusations of child sex abuse against Victim-1 would be obviously counterproductive; and (4) "compliance with the threatener's demands provides no assurance against additional demands based on renewed threats of disclosure," *i.e.*, if Victim-1 had paid the defendant, nothing would have prevented the defendant from renewing her threats of disclosure and demanding more money. *Jackson*, 180 F.3d at 71.

In short, the Indictment more than sufficiently alleges "the elements of the offense charged and fairly informs [the] defendant of the charge against which [s]he must defend, and, second, enables [her] to plead an acquittal or conviction in bar of future prosecutions for the same

offense," *Hamling*, 418 U.S. at 117. The defendant's attempt to litigate before trial issues the jury will ultimately decide, including her intent, is improper and must be rejected.

## III.    COUNT TWO DOES NOT VIOLATE THE FIRST AMENDMENT.

Next, the defendant makes the extraordinary claim that Congress enacted an "overbroad" and, therefore, facially invalid law in violation of the First Amendment when it passed Section 2261A. Courts have repeatedly rejected such facial challenges to this statute and this Court should too. The defendant also argues that the statute is unconstitutional as applied to her, but her argument fails because the Indictment targets speech that is unprotected by the First Amendment— speech integral to criminal conduct and defamation.

### A. Section 2261a Does Not Violate the First Amendment on its Face

#### 1. Applicable Law

The Supreme Court has long recognized that "the overbreadth doctrine is 'strong medicine' and ha[s] employed it with hesitation, and then 'only as a last resort.'" *New York v. Ferber*, 458 U.S. 747, 769 (1982). The burden of establishing overbreadth rests on the party challenging the statute. *Virginia v. Hicks*, 539 U.S. 113, 122 (2003).

A statute is impermissibly overbroad under the First Amendment—and facially unconstitutional—if it prohibits "a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). Further, "[t]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Id.* at 303 (internal quotation mark omitted). The Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* at 292–93.

### 2. Discussion

Facial "overbreadth" challenges to Section 2261A have repeatedly failed. Indeed, "every circuit court of appeals that has addressed a facial attack to § 2261A(2)(B)" has rejected such an attack. *See United States v. Fleury*, 20 F.4th 1353, 1362-1363 (11th Cir. 2021); *United States v. Ackell*, 907 F.3d 67, 73 (1st Cir. 2018) (concluding that § 2261A(2)(B) is not unconstitutionally overbroad, because even though the statute "could reach highly expressive conduct, it is plain from the statute's text that it covers countless amounts of unprotected conduct"); *United States v. Petrovic*, 701 F.3d 849, 856 (8th Cir. 2012) (concluding, under the prior version of the statute, that "[m]ost, if not all, of the statute's legal applications are to conduct that is not protected by the First Amendment"); *United States v. Osinger*, 753 F.3d 939, 944 (9th Cir. 2014) (rejecting an overbreadth challenge to the prior version of § 2261A(2)(B) and concluding that because the statute "proscribes harassing and intimidating conduct, the statute is not facially invalid"). The reasoning of those cases applies in full here and, as such, the Court should decline to employ the "strong medicine" of overbreadth and strike down Section 2261A(2)(B).

### B. Section 2261a Does Not Violate the First Amendment as Applied Here

### 1. Applicable Law

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." However, freedom of speech "is not an unlimited, unqualified right." *Dennis v. United States*, 341 U.S. 494, 503 (1951). The Supreme Court has long recognized that certain "well-defined and narrowly limited classes of speech" have so little social value that they are excluded from the protections of the First Amendment. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942). These categories of unprotected speech include, as relevant here, speech integral to criminal conduct, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949), and defamation, *Beauharnais v. Illinois*, 343 U.S. 250, 254-55 (1952).

### 2. Discussion

The defendant's as-applied challenge to Section 2261A(2)(B) must fail because her speech falls outside the protections of the First Amendment: first, it is speech integral to criminal conduct and, second, its core statement (that Victim-1 had sex with a minor) is false and defamatory.

First, the defendant's speech is unprotected because it is integral to criminal conduct. In *Giboney*, the Supreme Court established that the First Amendment does not protect "speech or writing used as an integral part of conduct in violation of a valid criminal statute." 336 U.S. at 498. As the Second Circuit has explained, "speech is not protected by the First Amendment when it is the very vehicle of the crime itself." *United States v. Gagliardi*, 506 F.3d 140, 148 (2d Cir. 2007) (internal quotation marks omitted); *see also Osinger*, 753 F.3d at 946 ("[W]here speech becomes an integral part of the crime, a First Amendment defense is foreclosed even if the prosecution rests on words alone."); *United States v. Larson*, 807 F. Supp. 2d 142, 164 (W.D.N.Y. 2011) ("[T]he First Amendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose.").

The defendant's motion is contrary to circuit court decisions that have rejected similar as-applied challenges to the cyberstalking statute, 18 U.S.C. § 2261A(2), on the ground that the speech at issue was integral to the charged criminal conduct. For example, in *Osinger*, the defendant allegedly posted demeaning statements and photographs regarding his ex-girlfriend ("V.B.") on Facebook and sent threatening and sexually explicit text messages and emails to V.B. and her co-workers and friends. 753 F.3d at 941-42, 945 (describing defendant's "unrelenting harassment and intimidation of V.B."). In rejecting the defendant's First Amendment challenge, the Ninth Circuit concluded that "[a]ny expressive aspects of Osinger's speech were not protected under the First Amendment because they were 'integral to criminal conduct' in intentionally harassing, intimidating or causing substantial emotional distress to V.B." *Id.* at 947.

23

Similarly, in *Petrovic*, the defendant allegedly carried out a campaign of vengeful harassment against his girlfriend ("M.B.") after she tried to end their relationship. *See* 701 F.3d at 852-53. The defendant created websites containing sexually explicit information about M.B. and mailed postcards to members of M.B.'s community with revealing photographs of M.B., derogatory statements about M.B., and directions to the defendant's website. *Id.* at 853. The was charged with cyberstalking and making interstate extortionate threats, in violation of 18 U.S.C. § 875(d). *Id.* at 852. The Eighth Circuit affirmed the denial of defendant's motion to dismiss the cyberstalking charges on First Amendment grounds, holding that defendant's communications "were integral to [his] criminal conduct as they constituted the means of carrying out his extortionate threats." *Id.* at 855; *see also United States v. Sayer*, 748 F.3d 425, 430, 433-34 (1st Cir. 2014) (affirming denial of motion to dismiss raising as-applied challenge to Section 2261A(2), since "everything that [defendant] allegedly said was integral to criminal conduct, his criminal conduct seeking to injure, harass or cause substantial emotional distress to the victim, and so not protected by the First Amendment under *Giboney*").

Here, there is no reason why the result in this case should be different than that reached by the courts of appeals in *Osinger*, *Petrovic*, and *Sayer*. The expression at issue—the defendant's harassing messages to Victim-1—was integral to the criminal conduct charged in each of the three counts of the Indictment. The expression was the "means" by which the defendant carried out the harassment and extortion against Victim-1. Furthermore, the defendant's motion barely addresses the "speech integral to criminal conduct" exception to First Amendment protection recognized by *Giboney*. In a footnote, she simply states: "[F]or the reasons stated in Part I, *supra*, the speech was not integral to any other criminal conduct, namely the extortion charges alleged." (Def. Mot. at 11 n.2). Because her challenge to the extortion counts fails for the reasons stated above, so too must

her as-applied First Amendment challenge fail under *Giboney* and its progeny related to "speech integral to criminal conduct." The Court need not go any further.

There is, however, a second, independent reason why the defendant's speech is unprotected: it is defamatory. Defamation generally consists of false statements that "tend[] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559; *see generally Chandok v. Klessig*, 648 F. Supp. 2d 449, 456 (N.D.N.Y. 2009) (discussing elements of civil defamation under New York law). Defamation has long been recognized as one of the categories of speech excluded from First Amendment protection. *See Beauharnais*, 343 U.S. at 254-55.

Here, the defendant's harassing, intimidating, and threatening text messages to Victim-1 related to the potential dissemination of a defamatory falsehood: that Victim-1 had sex with a minor, specifically "Mia," a fake persona that the defendant invented and that Victim-1 had never even met before. *See* Mot. at 4. The defendant, using her fake "Mia" persona, sent the defendant purported photographs of herself, but they were really photographs she stole from the Instagram profile of a young Russian model. (*See* Tremonte Decl. Ex. D. at USAO_002003-002004). Victim-1, however, believed that "Mia" was a different (adult) woman with whom he had previously had a sexual relationship. *Id.* After Victim-1 realized his confusion, he communicated that to the defendant's other fake persona, "Brian," telling Brian: "I confused her [*i.e.*, "Mia"] with someone else. She and I have never met before." (*Id.* at USAO_002004). Even though the defendant became aware of Victim-1's confusion and undoubtedly knew that the central tenet of scheme was false, she persisted in her campaign of harassment, intimidation, and threats to release to the public a falsehood. The First Amendment provides no protection for this kind of behavior.

Because the speech in this case falls outside the protection of the First Amendment, this case is distinguishable from *United States v. Cassidy*, 14 F. Supp. 2d 574 (D. Md. 2011), in which the court found that the Government's Indictment was "directed squarely at protected speech" and "not limited to categories of speech that fall outside of First Amendment protection," including "defamation" and "speech integral to criminal conduct." *Id.* at 583. Because the speech at issue in that case did "not fall into any of the recognized exceptions," the *Cassidy* court found that the "speech remains protected" and proceeded to analyze whether the statute was a "content-based restriction on *protected* speech," which triggers strict scrutiny, or a content-neutral restriction on protected speech, which triggers intermediate scrutiny. *Id.* (emphasis added). Here, the Court does not need to proceed that far, because the defendant's speech is integral to criminal conduct and related to defamatory falsehoods, placing it outside the protection of the First Amendment. Thus, the Court need not decide at this point, as part of a strict or intermediate scrutiny analysis, whether Victim-1 is a public figure or whether the defendant's speech relates to a matter of public concern for First Amendment purposes.

In sum, the defendant's as-applied challenge fails because this prosecution concerns speech integral to criminal conduct and alleged expression consisting of defamatory statements—areas that fall outside of the protections of the First Amendment.

## IV.    THE CYBERSTALKING STATUTE IS NOT UNCONSTITUTIONALLY "VAGUE."

In her final attempt to avoid trial on the charges in the Indictment, the defendant claims that the words "harass" and "intimidate" in Section 2261A are simply too vague to understand. This oft-rejected argument also fails.

### A. Applicable Law

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016). "Although a law has to provide minimal guidelines in the form of explicit standards regarding what conduct is unlawful, it need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013). Even in the absence of sufficient standards, however, "a statute will survive an as-applied vagueness challenge if the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *United States v. Farhane*, 634 F.3d 127, 139-40 (2d Cir. 2011).

Because vagueness challenges are "as applied," courts "must await conclusion of the trial" to determine whether a statute is unconstitutionally vague in a particular case. *United States v. Milani*, 739 F. Supp. 216, 218 (S.D.N.Y. 1990). As the Supreme Court has explained, "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *see also United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) ("Panel opinions of this Court have repeatedly held that when, as in the case before us, the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' *i.e.*, in light of the specific facts of the case at hand and not with regard to the statute's facial validity.").

27

### B. Discussion

As relevant here, Section 2261A(2)(B) prohibits, with the intent to "harass" or "intimidate," the use of interstate communications or facilities to engage in a course of conduct that "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person." The defendant argues that "[t]he *mens rea* element—to harass or intimidate—is too broad for an ordinary citizen to understand what is prohibited." (Def. Mot. at 18).

Tellingly, the defendant does not cite a single case in which a court has agreed with her argument, let alone a case decided before trial. Many courts have rejected vagueness challenges to the words "harass" and "intimidate" in Section 2261A and, in doing so, have found the words "harass" and intimidate" in the statute to be largely unremarkable. *See United States v. Conlan*, 786 F.3d 380, 385-86 (5th Cir. 2015) ("The statute need not define 'harass' and 'intimidate' because they are not obscure words and are readily understandable by most people."); *Osinger*, 753 F.3d at 944–45  (rejecting vagueness challenge to "harass" and "substantial emotional distress" in Section 2261A because "'harass' and 'substantial emotional distress' are not esoteric or complicated terms devoid of common understanding"); *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir.2012) ("'Harass and 'intimidate' are not obscure words. Most people would readily understand the former to mean 'to disturb persistently; torment, as with troubles or cares; bother continually; pester; persecute,' and the latter to mean 'to make timid; fill with fear'"); *United States v. Bowker*, 372 F.3d 365, 380 (6th Cir. 2004) ("[C]itizens need not guess what terms such as 'harass' and 'intimidate' mean."). This Court should similarly conclude, like (as far the Government can tell) every other court to consider the issue, that the words "harass" and "intimidate" in the statute are readily understandable. Accordingly, the defendant's void-for-vagueness challenge must fail because "ordinary people can understand what conduct is prohibited

28

and in a manner that does not encourage arbitrary and discriminatory enforcement." *Halloran*, 821 F.3d at 337.

The defendant seems to suggest that "harass" and "intimidate" can only survive a vagueness challenge if the object of the harassment and intimidation is the placement of a victim in reasonable fear of death or serious bodily harm, rather than substantial emotional distress. Mot. at 19. Not so. In fact, the *Conlan* court found that the concept of "substantial emotional distress" helped reduce, rather than exacerbate, any vagueness concerns. *Conlan*, 786 F.3d at 386 ("Any vagueness concerns are further alleviated by the list of easily understood terms surrounding 'harass' and 'intimidate'—'kill, injure ... or *cause substantial emotional distress'*—and by the statute's scienter requirement, which narrows its scope and mitigates arbitrary enforcement.") (emphasis added). Similarly, the *Shrader* court explicitly examined and upheld "harass" and "intimidate" in the specific context of "substantial emotional distress." *Shrader*, 675 F.3d at 311. In rejecting a vagueness challenge, the court explained:

> It is an element of the crime that he have intended harm to a particular victim. And it is similarly an element that the intended target have suffered substantial emotional distress as a result. Given that the government must prove both intent and effect, we need not worry that the statute sets an unclear trap for the unwary.

*Id.* The analyses of the words "harass" and "intimidate" in *Osinger* and *Bowker* were similarly not dependent on the placement of a victim in reasonable fear of death or serious bodily harm. *See Osinger*, 753 F.3d 939 at 945 (analyzing "harass" and "intimidate" without connection to reasonable fear of death or serious bodily harm); *Bowker*, 372 F.3d at 382 ("'[Harass[ ] or intimidate' could be adequately defined by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning.").

Because the defendant cannot plausibly claim that the statute leaves her "clueless,"

*Shrader*, 675 F.3d at 311, her vagueness challenge must fail.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should deny

the defendant's motions to suppress and to dismiss the Indictment.

Dated:  New York, New York
        February 17, 2023

                                        Respectfully Submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney for the
                                        Southern District of New York


                                By:     __/s/___
                                        Mollie Bracewell
                                        Justin Rodriguez
                                        Assistant United States Attorneys
                                        212-637-2218/2591


Cc:     Defense Counsel
        (Via ECF)


30