**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

       v.

SAKOYA BLACKWOOD,

           Defendant.

22 Crim. 460 (JMF)

**SENTENCING MEMORANDUM OF SAKOYA BLACKWOOD**

Michael Tremonte
Anna Estevao
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Fax: 212.202.4156
E-mail: mtremonte@shertremonte.com

*Attorneys for Sakoya Blackwood*

## I.      INTRODUCTION

When Sakoya Blackwood graduated high school in 2006, she should have gone to college.  She was a straight-A student and did well on her SATs.  She was the top of her class at Evander Childs High School in the Bronx.  But because she came from Jamaica as a child, she lacked legal immigration status and did not qualify for student loans.  Instead, at just 18 years old, she married an older man who subjected her to extreme physical and mental abuse.  Although she physically escaped, Ms. Blackwood never fully healed from the trauma.  She continued to experience the effects of PTSD and, like many survivors of domestic violence, continued to engage in unhealthy relationships and rely financially and emotionally on abusive men, living in the shadows and in fear of deportation.  It was from this position of fear, vulnerability, and resentment toward her abusers that Ms. Blackwood made the terrible decision to send harassing messages to a millionaire CEO.  After ten months at the MDC reflecting on her poor decisions, Ms. Blackwood now sees her conduct for what it was:  a misguided redirection of anger toward her own abusers with serious consequences.

Tragically, the person most impacted is Ms. Blackwood's 12-year-old daughter, "S.", whose life has been upended by her mother's incarceration and likely deportation.  Despite her faults and mental health challenges, Ms. Blackwood is a devoted mother.  She and S. have a powerful bond and Ms. Blackwood has worked tirelessly to ensure S.'s education and well-being.  As a straight-A student at the top of her class at a competitive charter school, S. has a promising future.  Unfortunately, Ms. Blackwood faces devastating immigration consequences that place her daughter's future in jeopardy.  After sentencing, Ms. Blackwood will be transferred to ICE custody and face removal proceedings.  If deported, Ms. Blackwood will be

1

faced with the terrible choice between permanent separation from S., or uprooting her daughter from the United States, where she has a bright future and tremendous educational opportunities.

Ms. Blackwood's arrest has been a dramatic wake-up call.  Confronted with potential deportation and incarcerated for the first time in her life, Ms. Blackwood has absorbed the enormous consequences of her poor decisions and could not be more ashamed.  At the MDC, Ms. Blackwood finally started taking responsibility for her own mental health.  She began receiving treatment from the facility's psychology department and embraced every available opportunity for self-improvement, from college courses to domestic survivor support groups. She enrolled in rigorous Columbia University history courses and was one of only a handful of students to complete them.  She performed so well in the program that she has been invited to apply for Columbia's Justice Scholars Program when she is released.

Ms. Blackwood pled guilty to one count of cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B).  The parties dispute the application of a two-level enhancement pursuant to U.S.S.G. § 2A6.2(b)(1)(E), which would increase the Guidelines range from 18-24 months to 24-30 months.  Regardless of the Guidelines calculation, Ms. Blackwood agrees with the Probation Department that a sentence of time served (approximately 11 months) would be sufficient to achieve the purposes of sentencing, as it would reflect the severe immigration consequences she will face, the needs of her minor child, her history of suffering extreme domestic violence, and her sincere rehabilitative efforts.  We attach letters of support from Ms. Blackwood's many family, friends, and supporters (Exhibit A); a clinical and forensic psychological report by Jessica Pearson, Psy.D. (Exhibit B); Ms. Blackwood's certificates from Columbia University and the MDC (Exhibit C); immigration records (Exhibit D); and records related to Ms. Blackwood's daughter (Exhibit E).

## II.    PERSONAL HISTORY AND CHARACTERISTICS

### A. Ms. Blackwood's Childhood and Adolescence Were Marred By Neglect and Abuse

Ms. Blackwood was born in 1988 in Kingston, Jamaica, the only child from her parents' relationship, yet one of 24 half-siblings. PSR ¶¶ 55-56. Her family was poor, with little income apart from what her mother earned selling shoes at flea markets. *Id.* ¶ 56. From a very early age, Ms. Blackwood was neglected, shuffled among family members, and witnessed ██████████ ████████. For example, she witnessed ██████████████████████████ ██████████████████████████████████████. *Id.* ¶ 57.

Ms. Blackwood's parents sent her to the United States in 2002, when she was 13 years old. *Id.* ¶ 59. She entered the country on a tourist visa and stayed in an apartment in the Bronx with her aunt, her aunt's boyfriend, and two cousins. *Id.* At the end of that summer, when Ms. Blackwood expected to go home to Jamaica, her parents told her she could not return. Abandoned and alone, Ms. Blackwood fell prey to ████████. ████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████

She endured this torment throughout her teenage years, afraid of going to bed and suffering from chronic sleep deprivation. To avoid going home, she spent weekends at her sister's house and volunteered after school and at church. *Id.* ¶ 61. She threw herself into her schoolwork and, despite her harrowing home situation, managed to excel at Evander Childs High School. Unfortunately, because she lacked immigration status and adult support, she was unable to pursue a college education. Instead, when she graduated from high school, she started

working at a daycare center and as a nanny – always off the books given her immigration status.

*Id*.

**B. Domestic Violence and Escape from New York**

██████████████████████████████████████████████████████

████

    █████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

    █████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

    Though she had escaped immediate danger, Ms. Blackwood was still without any resources or connections to help her build a life from scratch in California.  Soon, like other survivors of ████████████████████████, Ms. Blackwood found herself again reliant on an older man for financial support.[1]  Ms. Blackwood was just 19 when she began living with Christopher, 17 years her senior.  She became pregnant and gave birth to her daughter, S., in 2010.  When she and Christopher separated three years later, Ms. Blackwood and her daughter, now homeless,

---

[1]  █████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

experienced profound desperation.  In 2016 they moved to Georgia, where Christopher had

moved, in the hopes of ensuring that he would provide financial support for S.  However, Ms.

Blackwood was not able to secure employment or stable housing there.  She was also concerned

about her daughter's education.  Although S. showed tremendous academic promise, she was

stuck in one of the worst performing elementary schools in the state.  Ms. Blackwood knew that

something needed to be done to set her daughter on a path to success and academic achievement.

### C.  Dedication to Motherhood and Her Daughter's Academic Success

Determined to get her daughter a high-quality education, Ms. Blackwood returned to

New York around 2017 and enrolled S. in a ███████████ charter school.  ███████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████ █████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

Due to Ms. Blackwood's uncompromising dedication to her daughter's education, S. has

excelled in school, █████████████████████████████ █████████████████████████████

███████████████████████████████████████████████████████████████████████████████

---

[2] ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████

[3] ██████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
█████████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████

████████████████████████████████████

█████████████████████████████████

████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████



*S. receiving her* ████████ *Award*        *S. with a selection of her artwork and awards.*

Ms. Blackwood's family and friends tell of a uniquely close relationship: "The love she showers onto her child is very pure. You can see it just by the way they interact with each other, from teaching her how to navigate in these busy New York streets to helping her with homework and just life itself." Exh. A at 6; *see also id.* at 3 ("Sakoya has a close bond with her Daughter

7

and has never been absent from her life."); *id.* at 4 ("One of the attributes I admired about her is

the way how she raised Daughter [S.], and her undying love for her.").

To ensure a secure life for her daughter, after returning to New York in 2017, Ms.

Blackwood sought assistance from Sanctuary for Families, a non-profit that assists victims of

domestic violence.  With their help and pro bono assistance from Latham & Watkins, she filed

for relief under the Violence Against Women Act ("VAWA"), which provides a humanitarian

immigration remedy for non-citizen victims of domestic violence perpetrated by a citizen spouse.

Like many other VAWA petitioners, Ms. Blackwood also simultaneously applied for legal

permanent residence status.  Her applications were received by the USCIS on March 9, 2021,[4]

and both were pending at the time of her arrest in this case.

## III.   OFFENSE CONDUCT & POST-ARREST HISTORY

Although able to create stability for S., Ms. Blackwood struggled with the effects of

years-long ███████████████ abuse.  The COVID-19 pandemic compounded Ms.

Blackwood's difficulties.  Struggling in isolation and depleted by the demands of keeping up

with her daughter's academic requirements from home, Ms. Blackwood turned to the Internet.

She spent an inordinate amount of time on social media, and tried unsuccessfully to earn money

day-trading.  During this period of intense isolation and depression, Ms. Blackwood began

compulsively reading on the Internet about powerful men who engage in abusive conduct.  She

became particularly upset about narratives involving men who sexually took advantage of young

women or abused positions of political, social, or corporate power, and then got away with it.

---

[4]      Ms. Blackwood first tried to adjust her immigration status ten years earlier, when she was 21 years old.
Around 2009, when she escaped her marriage and was living in Los Angeles, she filed her first VAWA Self-
Petition, on her own and without the assistance of counsel.  USCIS requested further evidence in support of her
petition, but Ms. Blackwood received the request after her response was already past due.  Ms. Blackwood
submitted some supplemental information (e.g., additional affidavits, screen shots of text conversations in which he
threatened her, and authorization for criminal record review), but the petition was denied as abandoned.

She began contacting those who were rumored to have been involved in some kind of sexual assault, including sexual harassment, sexual assault of a minor, domestic violence, and other crimes.  Other times, she sent messages that would only elicit a response from those who wanted to have sexual conversations with a minor.

In March 2022, Ms. Blackwood texted Victim 1 – a 68-year-old Harvard-educated public company executive – posing as a young girl who had previously had sexual relations with him. She sent him photos of a 17-year-old Russian teenager.  Victim 1 mistook her for a girl for whom he had previously "paid for [her] trip to dance in Europe" and who had done "unmentionable things" to him several years earlier.  Later, when Ms. Blackwood confronted Victim 1 about the girl being underage, Victim 1 did not immediately deny it.  Ms. Blackwood took that as proof he had sexually abused a minor.  She threatened to release this information to the press.  Though she never released any information and never received any financial benefit, Ms. Blackwood understands that it was wrong to convey such messages, even to someone she believed to be a child predator.

Since her arrest in August 2022, Ms. Blackwood has been trying to understand the root cause of her behavior to ensure that it never happens again.  At the request of defense counsel, she met with Jessica Pearson, Psy.D.  Dr. Pearson concluded that Ms. Blackwood suffers from ███████████████████████████ that is directly related to her history of ███████████ ███████████████ *See* Exh. B at 7.  Dr. Pearson explains that Ms. Blackwood's ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████ *Id.*  Dr. Pearson concluded that these experiences "████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████ *Id.* at

8.  With Dr. Pearson, Ms. Blackwood explained ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████ *Id.* at 9.

    For the first time in her life, Ms. Blackwood is coming to terms with ████████████

███████████████████████████████████████████████████

███████████████████████████████ She is committed to adopting healthy coping strategies.

To that end, she has taken advantage of every available resource at the MDC.  ██████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

    These newfound efforts towards mental clarity have allowed Ms. Blackwood to be

productive and engaged, even within the confines of the MDC.  She is one of the few inmates at

the MDC who has reaped the benefits of Columbia University's Justice in Education

programming, which provides quality education to the most determined MDC students.  These

rigorous courses are cross-listed at Columbia University and taught in-person at the MDC by

renowned Columbia history scholars.  Ms. Blackwood has successfully completed the two

courses offered: "The Problem of Slavery in the Age of Revolutions"[5] and "The US Presidency: George Washington to Joe Biden"[6] – as well as a "History Since 1500" St. Francis course.  Exh. C at 1-2; PSR ¶ 83.  Her professors were so impressed with her coursework and attitude that they encouraged her to apply for Columbia's Justice Scholars Program, as well as the University's "Justice Through Code" program, which offers training and career opportunities for promising formerly incarcerated individuals.  PSR ¶ 84.  If released, Ms. Blackwood intends to apply to both programs.  The Columbia Justice Scholars Program, in particular, is only available to students who have been nominated by a Columbia course instructor.[7]  It offers students the opportunity to participate in typical first-year Columbia courses, while covering tuition and other

---

[5]     *See* Columbia Univ. Directory of Classes, The Problem of Slavery in the Age of Rev (Summer 2023), http://www.columbia.edu/cu/bulletin/uwb/#/cu/bulletin/uwb/subj/HIST/GU4187-20232-001 ("The history of conflicts within and over slavery during the American Revolution, the Haitian Revolution, the Wars for Latin American Independence, and the campaigns to abolish slavery in the British Empire.  The seminar gives special emphasis to the evolution of antislavery and proslavery arguments, the role of war in destabilizing practices of human bondage, and choices made by enslaved men and women in moments of rapid political change.").

[6]     *See* Columbia Univ. Directory of Classes, US Presidency Washington to Trump (Summer 2023), http://www.columbia.edu/cu/bulletin/uwb/#/cu/bulletin/uwb/subj/HIST/S3428-20232-001 ("This lecture examines how the American presidency evolved into the most important job on earth.  It examines how major events in the US and world history shaped the presidency.  How changes in technology and media augmented the power of the president and how the individuals who served in the office left their marks on the presidency.  Each class will make connections between past presidents and the current events involving today's Commander-in-Chief.  Some topics to be discussed: Presidency in the Age of Jackson; Teddy Roosevelt and the Presidential Image Making; Presidency in the Roaring '20s; FDR and the New Deal; Kennedy and the Television Age; The Great Society and the Rise of the New Right; 1968: Apocalyptic Election; The Strange Career of Richard Nixon; Reagan's Post Modern Presidency; From Monica to The War on Terror.").

[7]     According to a program administrator for the Columbia program, the MDC does not allow professors to formally recommend students until after they are released.  However, Ms. Blackwood is expected to receive such a letter of recommendation.

costs, and offering students other social and psychological services, with the goal of their applying and matriculating at Columbia's School of General Studies.[8]

While detained, Ms. Blackwood also does her best to stay engaged in her daughter's education and well-being.  She and her daughter speak every day on the phone about S.'s progress.  They have their own private "book club," where they simultaneously read the same book and discuss it as they go along.  Despite these efforts, the physical separation from her mother has been devastating for S. ████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

---

[8]      *See* Columbia Univ., Justice in Education Scholars Program, https://centerforjustice.columbia.edu/content/jie-scholars-program#:~:text=The%20JIE%20Scholars%20Program%20covers,academic%20advising%2C%20and%20peer%20mentoring; https://justiceineducation.columbia.edu/about/.

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

## III.   GUIDELINES CALCULATION

On March 28, 2023, Ms. Blackwood accepted responsibility for her actions and pled

guilty to cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B), a Class D felony with a five-

year maximum sentence.  *See* 18 U.S.C. § 2261(b)(5).  The parties agree that the base offense

level is 18, U.S.S.G. § 2A6.2(a), but disagree as to the application of a two-level "pattern of

activity" enhancement under § 2A6.2(b)(1)(E).  The resulting Guidelines under the government's

calculation is 24-30 months; under the defense's calculation it is 18-24 months.  PSR ¶ 7(c)(i).

### A.   Application of the "Pattern of Activity" Enhancement Would Result in Impermissible Double Counting

A sentencing enhancement results in impermissible double counting when it "increase[s]

a defendant's sentence to reflect the kind of harm that has already been fully accounted for by

the base offense level."  *United States v. Reingold*, 731 F.3d 204, 226 (2d Cir. 2013) (quoting

*United States v. Volpe*, 224 F.3d 72, 76 (2d. Cir. 2000)) (internal quotation marks omitted); *see*

*also United States v. Livoti*, 22 F. Supp. 235, 246 (S.D.N.Y.) ("In this Circuit, impermissible

double counting occurs where a court considers the same factor both in setting the base offense

level and in applying a special offense characteristic that enhances that level . . . .").  "There may

be some instances in which double-counting is improper even though the Guidelines do not

specifically address it."  *United States v. Olvera*, 954 F.2d 788, 791 (2d Cir. 1992).

U.S.S.G. § 2A6.2(b)(1) provides for a two-level enhancement where the defendant

engaged in "a pattern of activity involving stalking, threatening, harassing, or assaulting the same

victim."  The Application Notes define a "[p]attern of activity" as "any combination of two or

more separate instances of stalking, threatening, harassing, or assaulting the same victim." U.S.S.G. § 2A6.2, App. Note 1.  The statute of conviction, 18 U.S.C. § 2261A(2), similarly requires "a course of conduct" as an element of the offense, defined as "a pattern of conduct composed of two or more acts, evidencing a continuity of purpose." *United States v. Jordan*, 591 F. Supp. 2d 686, 721 (S.D.N.Y. 2008).

Allowing the minimum statutory offense conduct to satisfy the "pattern of activity" enhancement would result in impermissible double counting and result in application of the enhancement for every § 2261A conviction.  Indeed, it is a "course of conduct" that qualifies the conduct as "stalking" in the first instance, justifying its reference to § 2A6.2 (Stalking or Domestic Violence) and a base offense level of 18, rather than § 2A6.1 (Threatening or Harassing Communications), which has a base offense level of 12.  Therefore, this conduct has already been fully accounted for by the base offense level.  Under the circumstances, application of the enhancement would amount to impermissible double counting. *See United States v. Hudson*, 972 F.2d 504, 505-06 (2d Cir. 1992) (vacating sentence because of impermissible double counting where district court applied the base offense level for "aggravated assault" under the Guidelines because of the defendant's use of a car, and then separately imposed an enhancement for use of a "dangerous weapon," also based on the use of a car).

Moreover, the Sentencing Commission never envisioned that the necessary elements of § 2261A would – on their own – satisfy the "pattern of activity" enhancement.  This is evident from the Application Notes' definition of "stalking" to itself mean conduct described in 18 U.S.C. § 2261A. *See* U.S.S.G. § 2A6.2, App. Note 1.  Because "stalking" is defined as the "course of conduct" prohibited by § 2261A, a "pattern of activity involving stalking" must involve something more than just "stalking," i.e., the conduct described by § 2261A.

14

Because the same conduct would set the base offense level and serve as the basis for the enhancement, it constitutes impermissible double counting.  The correct Guidelines range is 18-24 months.

### B.  A Two-Level Variance Should Be Applied to Account for the Sentencing Commission's Anticipated Amendment for "Zero Point Offenders"

The Court should elect to apply a 2-level variance to account for the Sentencing Commission's anticipated amendment for "zero point offenders."  The amendment adds a new Chapter Four guideline at § 4C1.1 (Adjustment for Certain Zero-Point Offenders), which provides a decrease of 2 levels for those with zero criminal history points and meet other criteria.[9]  This amendment is intended to account for significant differences in recidivism rates between zero point offenders and others, including those with just one criminal history point.[10]  The proposed amendment was voted on by the Sentencing Commission on April 5, 2023 and submitted to Congress and expected to go into effect in November 2023.[11]  Because Ms. Blackwood meets all the new § 4C1.1 criteria and is in the category of offenders least likely to reoffend, the Court should account for the Sentencing Commission's findings and conclusions by varying downward by two levels.  The resulting Guidelines range would be 12 to 18 months.

---

[9]      *See* U.S. Sent. Comm'n, Amendments to the Sentencing Guidelines (April 27, 2023; Effective Date November 1, 2023) at 78-79, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.

[10]      *Id.* at 79; *see also* U.S. Sent'g Comm'n, Recidivism of Federal Offenders Released in 2010 (2021), https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.  The Sentencing Commission has also previously found that "women recidivate at a rate lower than men."  *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, U.S. Sentencing Comm'n (2004), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

[11]      *See* U.S. Sent. Comm'n Press Release (Apr. 5, 2023), https://www.ussc.gov/about/news/press-releases/april-5-2023.

IV.     **THE § 3553 FACTORS WARRANT A NON-CUSTODIAL SENTENCE**

District courts have an "overarching duty 'to impose a sentence sufficient, but not greater than necessary,' to serve the purposes of sentencing." *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)).  Though a sentencing court must consider the Guidelines as a "starting point," it must "then make an independent sentencing determination, taking into account the 'nature and circumstances of the offense and the history and characteristics of the defendant,' and all the statutory factors." *United States v. Singh*, 877 F.3d 107, 116 (2d Cir. 2017) (quoting *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008)).  A district court may not "presume that the [G]uidelines range is reasonable" and instead "must make an individualized assessment based on the facts presented." *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)).  In doing so, "a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *Singh*, 877 F.3d at 121 (internal quotation marks omitted).

**A.  Ms. Blackwood's History of Abuse and Domestic Violence Is Mitigating**

Courts have recognized that a history of suffering ██████████████████████ is a sound reason to exercise leniency.  *See, e.g.*, *United States v. Smith*, 155 F. Supp. 3d 260 (E.D.N.Y. 2016) (considering defendant's "traumatic childhood," "sexual abuse, domestic violence, and all of the stressors associated with extreme poverty" in concluding that a custodial sentence was unnecessary); *see also United States v. Brady*, 417 F.3d 326, 333 (2d Cir. 2005) (noting, in mandatory Guidelines case, that "a downward departure may be warranted on the ground that extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense"); *United State v. Rivera*, 192 F.3d 81, 85 (2d Cir. 1999) (stating, "[i]t seems beyond question that abuse suffered during childhood—at some level of severity—can impair a person's mental and emotional conditions").

Ms. Blackwood's extensive history of ███████████████████████ makes clear that, at the time she committed the offense, she was still "in trouble and in pain," *Singh*, 877 F.3d at 121, and her traumatic history should be considered in fashioning a sentence.  Indeed, her personal history and ███████████ are the center of this tragedy and directly related to the offense conduct.  Ms. Blackwood's formative years were characterized by ███████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████ ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

While no excuse for her own behavior, it is nonetheless relevant that Ms. Blackwood's conduct took place while she was struggling with untreated ███████████ perceiving Victim-1 as someone who had both unfairly taken advantage of every benefit that society conferred on him while appearing willing to victimize young women.  Having experienced complete powerlessness and fear at the hands of men who, to this day, have suffered no consequences, and

with no means of understanding or managing the acute post-traumatic stress from which she continues to suffer, Ms. Blackwood used the anonymity of the internet to make threats as a maladaptive coping mechanism to channel her deep pain and engage in a kind of misguided feminist vigilantism.  In reflecting on her actions, for the first time with the help of professional psychologists and a dom█████████ victims support group, Ms. Blackwood is now working to understand the root cause of this conduct and to manage her symptoms constructively.

**B.  The Needs of Ms. Blackwood's Daughter Warrant a Non-Custodial Sentence**

The Court should also consider Ms. Blackwood's daughter's needs when fashioning a sentence.  While the conviction of a parent always affects the well-being of that individual's children, here, the consequences of Ms. Blackwood's continued incarceration will be particularly damaging to S.  Ms. Blackwood is the most important source of stability and support in her daughter's life and none of Ms. Blackwood's relatives can effectively take her place.  Since Ms. Blackwood's arrest, her daughter has been in the care of the grandmother, who has since █████ ██ (in part due to her new childcare responsibilities), is currently ██████████████rent, and eager to shed these responsibilities.[12]  Ms. Blackwood is also concerned – based on her own first-hand experience – that the grandmother cannot provide the supportive and loving environment that her daughter needs and deserves.  The longer that her daughter stays in this situation, the more damage will accumulate.  Unsurprisingly, Ms. Blackwood's incarceration has already disrupted her daughter's positive trajectory in profound ways.  Her daughter has become ███████████████████████████████████████████████████████████████

Indeed, research has shown that children who have an incarcerated parent are especially

---

[12]      Ms. Blackwood's daughter also receives some financial support from her father, who lives in Georgia.

vulnerable to feelings of anxiety, behavioral issues, and school performance.[13]  The effects are usually more profound when the incarcerated parent is a mother,[14] and when the mother's incarceration was unexpected (from the child's perspective),[15] as it was here.

While it is uncertain whether Ms. Blackwood will be reunited with her daughter at the conclusion or her sentence or be subjected to indefinite immigration detention, continued incarceration will only further damage the mother-daughter bond and her daughter's well-being. Given the severe and specific impact that will be felt by Ms. Blackwood's daughter, leniency is appropriate. *See United States v. G.L.*, No. 12–CR–475 (JBW), 2015 WL 1517397 (E.D.N.Y. Apr. 2, 2015) (imposing time served sentence on a single mother, recognizing that no family members could assume care of her child with special needs); *United States v. Lee*, No. 15 Cr. 142-003 (RWS), 2016 WL 8674687, at *4 (S.D.N.Y. May 27, 2016) (departing downward in recognition of defendant's responsibilities as a single parent to a 13-year-old).

### C.  The Severe Immigration Consequences Justify a Time Served Sentence

Ms. Blackwood's conviction jeopardizes her VAWA and green card applications and may result in immigration detention at the conclusion of the case and subsequent deportation from the United States.  Ms. Blackwood's response to USCIS's request for information in support of her VAWA petition – including information about the disposition of this case – is

---

[13]     *See* Martha Sin Ki Luk, et al., *Physical and Psychosocial Impacts of Parental Incarceration on Children and Adolescents: A Systematic Review Differentiating Age of Exposure* (Feb. 2022), https://link.springer.com/article/10.1007/s40894-022-00182-9.

[14]     Dan Levin, *As More Mothers Fill Prisons, Children Suffer 'A Primal Wound'*, N.Y. Times (Dec. 28, 2019), https://www.nytimes.com/2019/12/28/us/prison-mothers-children.html.

[15]     Kristin Turney & Christohper Wildeman, *Detrimental for Some? Heterogeneous Effects of Maternal Incarceration on Child Wellbeing*, 14Crim & Pub. Pol. 1 (2015), https://kristinturney.files.wordpress.com/2015/11/turney-wildeman_2015_cpp.pdf

outstanding pending the outcome of her sentencing.[16]  And it appears as though her case has

been referred for immigration enforcement, *i.e.*, deportation proceedings.  *See* PSR at 1 (listing

ICE detainer), ¶ 59.

Whether Ms. Blackwood will be spared immigration detention and deportation depends

on whether she can establish VAWA eligibility, which itself turns on the legal question of

whether her offense of conviction renders her ineligible to establish "good moral character."  The

Immigration and Nationality Act ("INA") bars a finding of "good moral character" for any

VAWA applicant that has committed a "crime involving moral turpitude" (or "CIMT").[17]  It is

not clear whether Ms. Blackwood's offense of conviction – cyberstalking in violation of 18

U.S.C. § 2261A – qualifies as a CIMT.  No court or administrative body has addressed this exact

question, which will be determined in the first instance by immigration authorities.  If

cyberstalking is considered a CIMT, then Ms. Blackwood may be disqualified from VAWA

---

[16]     USCIS was alerted to Ms. Blackwood's arrest and, on October 21, 2022, issued a "request for evidence" of her "good moral character" in support of her VAWA application, including information about the final disposition of the arrest.

[17]     *See* 8 U.S.C. § 1101(f)(3) ("No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established is, or was . . . a member of one or more of the classes of persons . . . described in [§ 1182(a)(2)(A)] . . . if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period"); *see also* 8 U.S.C. § 1182(2)(A)(i)(I) (providing that alien convicted of "a crime involving moral turpitude" is inadmissible).
       People who have been convicted of an "aggravated felony" are also statutorily barred from being considered a person of good moral character, 8 U.S.C. § 1101(f)(8), and are also subject to removal under 8 U.S.C. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."), subject to immigration detention, *id.* § 1226(c)(1)(B), and ineligible for various forms of discretionary relief, such as cancellation of removal, *id.* § 1229b(a)(3).  It appears that cyberstalking likely would not qualify as an aggravated felony.  *See id.* § 1101(a)(43) (listing qualifying offenses).  Although the BIA previously held that certain stalking offenses qualified as aggravated felonies under the "residual clause" of 8 U.S.C. § 1101(a)(43)(F) and 18 U.S.C. § 16(b), *see Matter of U. Singh*, 25 I&N Dec. 670 (BIA 2012), the Supreme Court has since invalidated that provision as unconstitutionally vague, *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018); *see also Malta-Espinoza v. Gonzalez*, 478 F.3d 1080 (9th Cir. 2007) (pre-*Dimaya*, reversing BIA ruling that California stalking offense was crime of violence under the residual clause, and therefore not an aggravated felony); *Matter of Sanchez-Lopez*, 27 I&N Dec. 256, 257 n.2 (BIA 2018) (noting immigration judge's rejection of charge that aggravated stalking offense was aggravated felony).

relief and likely subject to immigration detention during the pendency of her removal proceedings, which could last months or even years.  If cyberstalking is not a CIMT, then Ms. Blackwood will have the opportunity to argue her eligibility for VAWA and may have the chance to remain in the United States with her daughter.  While Ms. Blackwood has the better of the argument,[18] she still faces a long road ahead.  Fortunately, she benefits from immigration policy that directs ICE to exercise prosecutorial discretion in favor of victims of domestic violence with pending VAWA applications,[19] and her VAWA application has already received prima facie approval, *see* Exh. D.  She also benefits from the advocacy of able immigration counsel.[20]

---

[18]         While not defined by statute, the BIA defines a CIMT as a crime that is "inherently base, vile, or depraved, and contrary to the accepted rules of morality and duties owed between persons or to society in general."  *Mendez v. Barr*, 960 F.3d 80, 82 (2d Cir. 2020) (citation omitted).  An "indispensable component" of a CIMT is "evil intent," meaning a mental purpose that is "inherently base, vile, or depraved."  *Id.* at 82 (citations omitted).  To determine whether a conviction qualifies as a CIMT, the BIA and courts use the "categorical approach," which involves looking "only to the minimum criminal conduct necessary to satisfy the essential elements of the crime."  *Id.* (citations omitted).  "To qualify, the crime must by definition, and in all instances, contain each of those elements that constitute a CIMT."  *Id.* (citation omitted).

            The Board of Immigration Appeals ("BIA") has previously held that certain aggravated stalking statutes involving threats of harm are considered CIMTs.  *See Matter of Ajami*, 22 I&N Dec. 949 (BIA 1999) (concluding that Michigan aggravated stalking statute was CIMT); *see also Orellana v. Barr*, 967 F.3d 927 (9th Cir. 2020) (affirming BIA conclusion that California stalking statute is CIMT).  However, the federal cyberstalking statute does not require such threats and can be violated through only an intent to harass causing substantial emotional distress.  *See* 18 U.S.C. § 2261A(b).  The USCIS Administrative Appeals Office has concluded that a stalking offense that does *not* require a threat to place a person in reasonable fear of death or bodily injury cannot be considered a CIMT.  *See In re: [Redacted]*, 2013 WL 8123886, at *3 (AAO 2013) (concluding that Florida stalking statute requiring only harassment that causes substantial emotional distress, but does not place victim in any fear of harm, to be distinguishable from *Ajami* and not a CIMT); *see also Coquico v. Lynch*, 789 F.3d 1049, 1054 (9th Cir. 2015) (unlawful laser activity, which requires only intent to harass, not CIMT; "Our precedent casts doubt on whether an intent to cause 'apprehension or fear,' rather than intent to injure, can ever be a CIMT.").  Legislative history also suggests that stalking offenses are not CIMTs.  In 1996, Congress added stalking offenses as a ground for deportation *in addition to CIMTs*.  This suggests that Congress did not view CIMTs as encompassing stalking.  *See Arriaga v. Mukasey*, 521 F.3d 219, 225 n.3 (2d Cir. 2008) ("The legislative history suggests that congress added these deportation grounds to close potential loopholes for aliens who commit crimes against women and children that did not clearly fall within other categories of deportable crimes such as crimes involving moral turpitude and aggravated felonies.").

[19]         *See* ICE Directive 11005.3: Using a Victim-Centered Approach with noncitizen Crime Victims (Aug. 10, 2021), https://www.ice.gov/doclib/news/releases/2021/11005.3.pdf.

[20]         Ms. Blackwood continues to be represented by Pooja Asnani, the Director of the Sanctuary for Families Immigration Project.

Whatever the outcome, this Court should consider these uncertainties in fashioning an appropriate sentence.  *See United States v. Thavaraja*, 740 F.3d 253, 263 (2d Cir. 2014) (explaining that "a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family," and affirming substantial downward variance).  Ms. Blackwood faces one of the most severe and cruel punishments available.  *See Padilla v. Kentucky*, 559 U.S. 356, 364 (2010) ("[A]s a matter of federal law, deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." (footnote omitted)); *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893) ("[T]o be forcibly taken away from home and family and friends and business and property, and sent across the ocean to a distant land, is punishment, and that oftentimes most severe and cruel.").  Needless to say, deportation will be an especially tragic and severe punishment here, both for Ms. Blackwood and her daughter.  If deported, Ms. Blackwood may be separated from her daughter and removed to a country where she knows no one and has no prospects, forever barred from reentering the United States.  This outcome will be especially tragic for her daughter, an innocent and promising twelve-year-old girl who is otherwise on the brink of leading a successful and college-bound life.  These consequences are so severe that Ms. Blackwood will choose to remain in ICE custody indefinitely in order to fight her immigration case.

### D.  Ms. Blackwood's Rehabilitative Efforts Justify a Time Served Sentence

After a lifetime of hurt and maladaptive coping, Ms. Blackwood has been confronted with the results of her failure to take responsibility for her own mental health.  And despite her awful conditions of confinement at the MDC, Ms. Blackwood has made significant progress in

addressing her mental health needs.  Indeed, it is a testament to her sincere commitment to change that she is able to do so while enduring the indignities and stressors at the MDC.

As the Court is aware, the MDC has been plagued with dysfunction, danger, and corruption.[21]  The women's unit, in particular, is known for its disgusting and unsanitary conditions,[22] as well as rampant sexual assault.[23]  Ms. Blackwood's experience at the MDC during the past 10 months has been entirely consistent with these disturbing reports.  She has seen cockroaches in her food and lacked fresh water to drink.  She received moldy sanitary products. ████████████████████████████████████████

████████████████████  These conditions should all be factored into the Court's sentencing decision.  *See United States v. Fajardo*, No. 03 CR 156-04 (RWS), 2006 WL 3498640, *4 (S.D.N.Y. Dec. 5, 2006) ("[T]he Court takes note of the conditions of pre-sentence detention in this case for purposes of determining the proper sentence.").

Despite these conditions, Ms. Blackwood has made tremendous progress and taken advantage of every possible opportunity.  Ms. Blackwood has opened up about and explored the root causes of her ████████████████████████████████████████

---

[21]     The PSR describes Ms. Blackwood being sanctioned for participating in a fight and possessing a dangerous weapon.  This was entirely out of character for Ms. Blackwood, who was acting in self-defense in a dangerous environment.  She has never been in another physical altercation, before or since, other than the aforementioned domestic violence.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[22]     Tiffany Days, *In Her Own Words: An Inmate Describes Conditions at NYC Federal Jail*, N.Y. Daily News (May 7, 2021), https://www.nydailynews.com/new-york/ny-mcc-inmate-account-20210507-4qhsp2zjmzfy7mqonvnixoprmq-story.html; John Marzulli, *Judge Refuses to Send Women to Brooklyn Jail with 'Third World' Conditions*, N.Y. Daily News (Oct. 7, 2016), https://www.nydailynews.com/new-york/brooklyn/judge-refuses-send-women-horrifying-brooklyn-jail-article-1.2820551.

[23]     Joseph Goldstein, *Brooklyn Prison Supervisors Charged With Sexually Assaulting Inmates*, N.Y. Times (May 25, 2017), https://www.nytimes.com/2017/05/25/nyregion/prison-supervisors-sex-abuse-prevention-rape-charges.html?mcubz=1&_r=0.

██████████████████████████████████████████████████

████████, excelled in college courses, and made a plan for her future.  If given the opportunity, she

is eager to take advantage of the Columbia University Justice in Education programs, attend to

her immigration case, secure employment with the assistance of resources from Sanctuary for

Families, and continue caring for her daughter.

Ms. Blackwood's efforts should give this Court

assurances about her personal rehabilitation and

commitment to continuing this progress going

forward.  More than anything, Ms. Blackwood

realizes that she needs to take better care of

herself in order to be there for her daughter, her

primary motivator and source of strength.

Nevertheless, while Ms. Blackwood presents zero risk of reoffending, she is fully

prepared to agree to electronic monitoring of her devices, an extended period of supervision, and

meaningful participation in mental health treatment.  The Court is also free to condition a period

of supervised release on additional requirements, such as applying for and participating in (if

accepted) one of Columbia's Justice-in-Education programs.

## VI.

## CONCLUSION

As Ms. Blackwood will explain in her own words at sentencing, she is deeply remorseful.

She recognizes the severity of her conduct and makes no excuse for her mistakes.  But given the

immigration consequences she faces, the needs of her daughter, and the quality and degree of her

rehabilitation, we respectfully urge the Court to temper justice with mercy, and impose a

sentence of time served.

Dated: New York, New York
      July 5, 2023

                      Respectfully submitted,

                    By:     /s/ Michael Tremonte
                          Michael Tremonte
                          Anna Estevao
                          Sher Tremonte LLP
                          90 Broad Street, 23rd Floor
                          New York, NY 10004
                          (212) 202-2600