UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                       :

UNITED STATES OF AMERICA,          :

                                       :

       - v. -                 :       22 Cr. 460 (JMF)

                                         :

SAKOYA BLACKWOOD,           :

                                         :

       Defendant.           :

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007
*Attorney for the United States of America*

Justin Rodriguez
Assistant United States Attorney
   *Of Counsel*

## I.        INTRODUCTION

For months, the defendant harassed and tried to extort the Chief Executive Officer of a large company (the "Victim") for her own financial gain. She threatened to publicly release sexually explicit photographs and communications with the Victim and, in the process, to falsely accuse him of a horrific crime that he did not commit. Specifically, the defendant caused the Victim to live in fear that, at any moment, she would falsely tell the world that the Victim had sex with a minor—a blatant lie which she invented out of whole cloth.

The defendant now claims that her behavior took place at a time when she was "compulsively reading on the Internet about powerful men who engage in abusive conduct." Def. Mem. at 8. But there should be no mistake: There has never been even an allegation, from anyone, that the Victim has ever engaged in "abusive conduct" of any kind. The defendant's actions in this case were far from righteous. They were not the heroics of a valiant truth-teller seeking to hold a wrongdoer accountable. They were cruel, selfish machinations undertaken in the hope of extracting money from an innocent person who committed no crime.

To prevent an irreparable, life-destroying injury, the defendant demanded that the Victim pay her a ransom of hundreds of thousands of dollars. To execute her scheme, the defendant employed sophisticated and devious means. She created and carried on multiple online personas. She obtained the private cellphone number of not only the Victim, but also the Victim's son and six members of the board of directors of the Victim's company—threatening to destroy the Victim's life by disclosing to those close to him her false claims.

While there are significant mitigating factors, the Government respectfully submits that a significant term of imprisonment is needed to achieve the goals of sentencing.

## II.     OFFENSE CONDUCT

On March 16, 2022, the defendant began her campaign of harassment and attempted extortion. PSR ¶ 12. On that day, having somehow obtained the Victim's private cellphone number (a testament to her skill), she started sending him text messages, pretending to be a woman named "Mia." *Id.* In fact, "Mia" does not exist. She is a fake persona that the defendant created for her scam. The defendant took steps, however, to try and conceal her true identity by using a Voice Over Internet Protocol ("VoIP") number—a recurring hallmark of her grift—that is more difficult to trace than a traditional cellphone. *Id.*

In the beginning, the Victim mistakenly believed that "Mia" was an adult woman with whom he had a previous romantic relationship, specifically a ballet dancer. *See* PSR ¶ 12. Within their first few messages and before "Mia" had shared a picture of herself, the Victim asked, "Is my memory right that you were into ballet?" and the defendant responded, "Yes!" Based on his misunderstanding of who "Mia" was, which the defendant perpetuated, the Victim exchanged messages with "Mia" about meeting in person in New York. *Id.* They also exchanged sexually explicit messages. PSR ¶ 13.

Then, on March 17, 2022, the defendant—to gather ammunition for her extortion plot— asked the Victim to send her sexually explicit photographs and the Victim complied. A couple days later, on March 19, the Victim asked "Mia" to send a picture of herself. In response, the defendant sent the Victim a picture of a Russian model that she stole from the model's Instagram page. PSR ¶ 13. The defendant continued to send the Victim additional pictures of the model, passing them off as pictures of "Mia." PSR ¶ 14. Over the next few days, the defendant repeatedly lied about "Mia's" location, her activities (claiming, for example, to be in St. Bart's for a modeling job), and her availability for an in-person meeting. *Id.* At the same time, "Mia" and the Victim

2

continued to exchange sexually explicit messages. *Id.*

As the weeks passed, the defendant continued to goad the Victim into sending her more sexually explicit photographs that she could later use to demand her ransom. On April 4, 2022, "Mia" messaged the Victim, "Send me a naughty picture." PSR ¶ 15. The Victim responded by sending "Mia" several explicit photographs of himself and another woman. *Id.* After the Victim sent some photographs, "Mia" pressed him, "Send me more," and the Victim complied, sending more sexually explicit photographs on April 4 and on April 8. *Id.*

After securing the photographs from the Victim, the defendant moved her con to the next phase: she created and introduced another fake persona, this time a villain poised to expose the Victim. On April 11, 2022, the defendant began sending text messages to the Victim, using another VoIP number, purporting to be someone named "Brian," an ex-boyfriend of "Mia." PSR ¶ 16. "Brian" told the Victim, in substance, that he had "Mia's" phone and saw some "incendiary shit" on it. *Id.* "Brian" said that he was "probably selling the information," that "Ceo scandal is apparently lucrative," and that he was going to see "what the national enquirer is offering." *Id.*

Not only did the defendant have "Brian" threaten to release the photographs and text messages, but she also made clear that part of the public outing would include accusing the Victim of a crime that he did not commit. *See* PSR ¶ 16. On April 14, 2022, at 9:17 p.m., "Brian" messaged the Victim, "She [i.e., "Mia"] wasn't even 18 yet so you know what that means." Then, at 11:22 p.m., "Brian" added: "What should concern u is 5yrs ago she wasn't 18 yet." Less than 40 minutes later, on April 15, 2022, at 12:01 a.m., the Victim told "Brian": "I confused her ["Mia"] with someone else. She and I have never met before." *See* PSR ¶ 17.

It bears emphasizing that there is no evidence that the Victim ever had sex with an underage person and there was no reason for the defendant to believe that he did. For starters, the Victim

could not have had sex with "Mia" when she was a minor because "Mia" was a fake persona that the defendant invented. Nor is there any evidence that the Victim has ever met the Russian model in the photographs the defendant passed off as "Mia," let alone any evidence that he had sex with her as a minor. Indeed, the Victim was clear with the defendant from the beginning that he believed "Mia" was a ballet dancer with whom that he had a prior relationship, a misunderstanding that the defendant played into. And when "Brian" made the accusation, the Victim denied it and explained the confusion. The defendant nevertheless persisted with her lies because they were her ticket to a potentially huge pay day.

After bringing "Brian" into the picture, the defendant quickly ramped up the pressure on the Victim. "Brian" sent the Victim images of the Victim's text messages with "Mia," as well as photographs they exchanged. PSR ¶ 17. On April 16, 2022, "Brian" threatened the Victim that he would "text/email all the members of your company board the vids/images." PSR ¶ 18. "Brian" then messaged the Victim the names and non-public cellphone numbers of six members of the board of directors of the Victim's company, as well as the cellphone number of one of the Victim's sons. *Id.* "Brian" said: "Offers are coming in like crazy ppl love a scandal." *Id.*

At this point, the Victim sought the assistance of an attorney, hoping that would cause the defendant to stand down. Unfortunately, the defendant was not deterred. On April 17, 2022, the Victim sent "Brian" a copy of a letter from his attorney, warning "Brian" of the criminal nature of his actions and demanding that he stop. PSR ¶ 19. The Victim also told "Mia" about the letter. *Id.* "Mia" told Victim-1 that the letter to "Brian" would do more harm than good. *Id.* She said "he could do more damage than you could while getting paid for doing it." *Id.*

On April 19, 2022, the defendant introduced yet another character into her scheme. She began sending text messages to the Victim, using another VoIP number, purporting to be someone

who worked at a media agency (the "Media Contact"). PSR ¶ 20. The Media Contact told the Victim that "[w]e received a tip regarding you" that "promised to be damning." *Id.* The Media Contact added: "This is extremely unorthodox, I am reaching out because I am a shareholder. And I'm worried the information will cause adverse reaction." *Id.* On April 20, 2022, the Media Contact told the Victim that the Media Contact brought the information to their boss and that they made a deal with the seller of the information for $250,000. PSR ¶ 21.

The defendant continued to push. On April 22, 2022, "Mia" told the Victim: "he's [Brian's] going for the money my guess us some time next week maybe speak with your family so they're not blindsided." PSR ¶ 22. That same day, "Brian" told the Victim "you can't tell me what to do" and the "smart move was u should've been trying to make a deal." *Id.* "Brian" also claimed that there was a "bidding war" for the information that reached $315,000 at one point. *Id.*

By April 24, 2022, the Victim (through his attorney) had contacted the FBI and, at law enforcement's recommendation, the Victim did not "make a deal" with Brian as the defendant had insisted. Accordingly, the defendant had to adjust her con, this time trying to manipulate Victim into paying up for the sake of "Mia." Between April 27 and April 29, 2022, "Brian" told the Victim that "Mia" raised $300,000 to keep the information about the Victim quiet. PSR ¶ 23. According to "Brian," "Mia" raised the money by selling her eggs. *Id.* "Brian" did not feel comfortable taking "Mia's" money so he gave the Victim a choice: reimburse "Mia" for the $300,000, or "Brian" will give "Mia" her money back and go forward with his original plan of releasing the information. *Id.*

Taking her campaign to a new front, on April 29, 2022, the defendant began using a Twitter account to tweet veiled threats at the Victim. PSR ¶ 24. She tweeted about a scandal brewing around the Victim and rhetorically asked what would happen to the share price and shareholders of the Victim's company when the compromising information is released. PSR ¶¶ 24, 25.

5

Throughout the summer, the defendant continued to harass the Victim in the hope that he would give in and pay her, expanding her cast of characters yet again. On May 25, "Brian" messaged the Victim, "Journalists reaching out to me now!"  PSR ¶ 26. Then, on June 21, the defendant began sending text messages to the Victim from another VoIP number, purporting to be a reporter from Vanity Fair (the "Vanity Fair Reporter"). PSR ¶ 27. The Vanity Fair Reporter referenced having seen texts and images ("I was shown some images and I was wondering if you're available to speak" and "I was also shown text conversation with the accompanying images and my source claim the woman was underage at the time of the initial affair"). *Id.* The next month, on July 26, 2022, "Brian" messaged the Victim and said, "A porn site just reached out to me looking for the pics." PSR ¶ 28.

On August 31, 2022, the defendant was arrested at her home in the Bronx.

### III.    THE DEFENDANT'S GUILTY PLEA AND APPLICABLE GUIDELINES RANGE

On March 28, 2023, the defendant pleaded guilty, pursuant to a plea agreement with the Government, to one count of cyberstalking. As part of the agreement, the defendant stipulated that her base offense level is 18. PSR ¶ 7. The agreement makes clear the Government's view that, pursuant to U.S.S.G. § 2A6.2(b)(1)(E), a two-level increase is warranted because the offense involved a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim, and that, therefore, the applicable Guidelines range is 24 to 30 months' imprisonment. *Id.* The agreement also reserves for the defendant the right to contest application of the two-level enhancement pursuant to U.S.S.G. § 2A6.2(b)(1)(E) as "impermissible double-counting." *Id.*

As an initial matter, there does not seem to be any dispute among the parties that Section 2A6.2(b)(1)(E), by its plain terms, applies to the facts of this case. Instead, the defense argues that applying that enhancement would be impermissible double-counting. The Government submits

that application of Section 2A6.2(b)(1)(E) is not impermissible in this case for several reasons.

First, the Government is not aware of any case, let alone controlling precedent, that prohibits application of Section 2A6.2(b)(1)(E) for convictions, like the defendant's, under 18 U.S.C. § 2261A(2) as impermissible double-counting, and the defendant points to no such authority.

Second, there is nothing in the Guidelines or the relevant statutes reflecting the Sentencing Commission's intent to preclude the application of Section 2A6.2(b)(1)(E) in this kind of case. *See United States v. Young*, 811 F.3d 592, 601 (2d Cir. 2016) ("[D]ouble-counting is impermissible if the Guidelines instruct against it."); *United States v. Morris*, 350 F.3d 32, 37 (2d Cir. 2003) (rejecting double-counting argument because the defendant "offered nothing in the Sentencing Guidelines or relevant statutes reflecting an intent to preclude the double counting the District Court employed"). When the Sentencing Commission wants to preclude impermissible double counting, it expressly declares that intent in the relevant Guidelines. *See United States v. Lilly*, 13 F.3d 15 (1st Cir. 1994) ("The Sentencing Commission has not been bashful about explicitly banning double counting in a number of instances."); *see also* Sections 1B1.3 (background), 2A6.2 (application note 4), 2K2.4 (background), 3D1.2 (application notes 2, 4, and 5). Here, the Commission has not expressly declared an intent to prohibit application of Section 2A6.2(b)(1)(E) to convictions under Section 2261A(2).

Third, the base offense level and the specific offense characteristics in the enhancement have separate and distinct sentencing purposes. According to the Sentencing Commission, the base offense level of 18 is the appropriate starting point for the crimes of interstate domestic violence, in violation of 18 U.S.C. § 2261, interstate violation of protection orders, in violation of 18 U.S.C. § 2262(a)(1), and interstate stalking, in violation of 18 U.S.C. 2261A. Despite their similarities,

7

the Commission approved increasing the base offense level for these crimes when certain offense characteristics are involved. The potential enhancements, under 2A6.2(b), have the independent purpose of increasing punishment when the specified aggravating facts occurred. Because the base offense level does not fully account for the harm associated with actions like those of the defendant's, the additional enhancement is permissible.

Taking it to its logical conclusion, the defendant's argument prevents an enhancement under 2A6.2 regardless of the severity, frequency, or duration of the course of conduct in the offense of conviction. This approach plainly contradicts Application Note 3 which states: "In determining whether subsection (b)(1)(E) applies, the court shall consider, under the totality of the circumstances, *any conduct* that occurred prior to or during the offense." (emphasis added). Thus, application of subsection (b)(1)(E) here based on the defendant's pattern of harassing the Victim is appropriate because the base offense level did not take that pattern into account and did not capture the full severity of the defendant's behavior.

## IV.    THE SENTENCING FACTORS

### A.  Applicable Law

The Guidelines are no longer mandatory, but they continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005); *see also United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker*/*Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and

the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 569, U.S. 530, 549 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id.* at 112; *see also United States v. Corsey*, 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or

9

impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. *See Crosby*, 397 F.3d at 112. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* at 113. In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances. *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

### B. Discussion

The Government respectfully submits that a significant term of imprisonment is necessary to reflect the seriousness of the offense, promote respect for the law, and afford adequate deterrence.

The nature and circumstances of the offense demand a significant sentence. Above all else, the defendant's behavior was heartless. For many months, the defendant kept the Victim suffering from the constant fear that his life would be ruined. She taunted him with the prospect of releasing embarrassing materials and, even worse, false accusations that he had sex with someone who was underage. As set forth in Part II above, the defendant knew full well the impact such disclosures would have had on the Victim, his family, and his company.

To make matters worse, the defendant was relentless. The defendant's crime was hardly an isolated incident, or the product of a momentary lapse in judgment. To the contrary, it was a long con that played out over many months. At countless points, the defendant could have stopped, particularly when the Victim's lawyer sent her a letter that detailed the criminal nature of her actions. The defendant, however, proved to be unfazed and committed to her scam.

Frighteningly, the defendant showcased significant sophistication. She was able to obtain the private cellphone numbers of the defendant's son and members of his board of directors, dangling those in front of the Victim in the hope that it would cause him to meet her price. She used different online personas and seamlessly transitioned between them. She also used accounts and numbers that made it difficult for law enforcement to track her down.

In her sentencing submission, the defendant seems to suggest that her conduct was driven by a sort of vigilantism. Def. Mem. at 8-9. She notes that "[s]he became particularly upset about narratives involving men who sexually took advantage of young women or abused positions of political, social, or corporate power, and then got away with it." *Id.* at 8. As a result, she says, "[s]he began contacting those who were rumored to have been involved in some kind of sexual assault, including sexual harassment, sexual assault of a minor, domestic violence, and other crimes." *Id.* at 9. The Court should give little weight to this explanation for several reasons.

As an initial matter, and as emphasized above, there is not a shred of evidence, not even an allegation or a "rumor[]," that the Victim has engaged in any behavior of this kind. The common characteristic of the men that the defendant contacted as part of her scheme is that they are all wealthy and, therefore, have the means to make significant extortion payments. Furthermore, if the defendant was truly motivated by a desire to expose abusive men, then she would have released the defendant's explicit photographs and communications. If she had done that, however, she would have lost all hope of ever getting paid.

Overall, the heartlessness, duration, and sophistication of the defendant's conduct demand just punishment that can only be met by a significant term of imprisonment.

A significant sentence is also needed to promote respect for the law and afford adequate deterrence. As discussed above, the defendant's crime was sophisticated. As a result, it was

difficult to identify the defendant and apprehend her in a timely way. It is therefore important to show digital fraudsters that when someone is caught committing such a fraud, the consequences are serious.

Without question, the defendant has identified significant mitigating factors, such as her childhood and adolescence, her romantic relationships, and her family circumstances, that deserve serious consideration. It is especially tragic that the defendant's criminal choices are having grave consequences for her daughter. Notwithstanding those mitigating factors, however, a significant sentence is still necessary to achieve the goals of sentencing.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Government respectfully submits that a significant term of imprisonment is necessary in this case.

Dated:  New York, New York
       July 12, 2023

<div style="margin-left:50%">

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:     <u>  /s/                  </u>
        Justin Rodriguez
        Assistant United States Attorney
        212-637-2218/2591

</div>

Cc:    Counsel of Record
       (Via ECF)