M916BLAC                    Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          22 CR 460(JMF)

5   SAKOYA BLACKWOOD,

6              Defendant.

7   ------------------------------x

8                                    New York, N.Y.
                                     September 1, 2022
9                                    11:00 a.m.
    Before:
10
                    HON. JESSE M. FURMAN,
11
                                         District Judge
12
                         APPEARANCES
13

14  DAMIAN WILLIAMS,
         United States Attorney for the
15       Southern District of New York
    BY:  MARY E. BRACEWELL
16       Assistant United States Attorney

17  MARNE L. LENOX
         Attorney for Defendant
18
    Also Present:
19  Elizabeth Wheeler, FBI

20

21

22

23

24

25

M916BLAC                        Conference

1           (Case called)

2           MS. BRACEWELL:  Good morning, your Honor.

3   Mary Bracewell for the government, and joining me is

4   Elizabeth Wheeler of the FBI.

5           THE COURT:  Good morning.  Good to see you.

6           MS. LENOX:  Good morning.  For Ms. Blackwell,

7   Federal Defenders, Marne Lenox.

8           THE COURT:  Good morning.  We're here for purposes of

9   initial arraignment and bail appeal.  I am a district judge

10  here in the Southern District of New York and have been

11  assigned to the case, which means I'll be the judge who will

12  preside over a trial, if there's going to be a trial in this

13  matter.  In the event you are convicted, I will be the judge

14  who will impose sentence.

15          Like I said, one of the primary reasons we're here is

16  for purposes of arraignments.  Is there anything to discuss

17  before I proceed to arraignment, Ms. Bracewell?

18          MS. BRACEWELL:  No, your Honor.

19          THE COURT:  Ms. Lenox?

20          MS. LENOX:  No, your Honor.

21          THE COURT:  Okay.  Ms. Blackwood, if you would please

22  rise.

23          Have you seen a copy of the indictment, 22 CR 460,

24  charging you with two counts?  Have you seen a copy of that?

25          THE DEFENDANT:  Yes, your Honor.

M916BLAC                              Conference

1          THE COURT:  Have you read it?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  Have you discussed it with Ms. Lenox?

4          THE DEFENDANT:  I have.

5          THE COURT:  You have the right to have me read it and

6    summarize it out loud, unless you waive that right.  Do you

7    waive the right for me to make a public reading?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  How do you plead at this time, guilty or

10   not guilty?

11          THE DEFENDANT:  Not guilty.

12          THE COURT:  All right.  Thank you very much.  You may

13   be seated.

14          Ms. Bracewell, I read the indictment, I've read your

15   letter.  With respect to the bail issue, which contains some of

16   the particulars, is there anything else I should know by way of

17   background before we talk about discovery?

18          MS. BRACEWELL:  No, your Honor.  I think the materials

19   reference much of the factual overview of the offenses.

20          THE COURT:  The microphones seem to be acting up

21   again.  Just speak directly into it as possible.

22          MS. BRACEWELL:  Sure.

23          THE COURT:  Now, let me ask you, have you provided

24   notification?  It seems to be at least one person who qualifies

25   as a crime victim, Crime Victim's Rights Act.  Have you

M916BLAC                        Conference

1    notified that person of this proceeding, and is there

2    assistance to do so going further.

3         MS. BRACEWELL:  We've been in communication with

4    Victim 1's attorney, and we'll continue to do so.

5         THE COURT:  Now, can you tell me what the nature and

6    status of discovery is?

7         MS. BRACEWELL:  Sure.  Discovery will consist of a

8    variety of different types of documents, various subpoena

9    returns from banks, financial institutions, social media

10   platforms, Internet service providers.  We also will be

11   providing communications between the catfish victim and

12   Victim 1 and the defendant.  We conducted a variety of

13   searches, searches of several e-mail accounts, of social media

14   accounts, a Facebook account, and another social media

15   platforms.

16        Yesterday, we also conducted a physical search of the

17   defendant's residence, and I would note we obtained a number of

18   electronic devices.  I believe we seized six cell phones, three

19   laptops, and three tablets.  And so we will be seeking to

20   access the contents of those devices as promptly as possible.

21        THE COURT:  First of all, searches that you've already

22   conducted, were they pursuant to warrant or some other basis?

23        MS. BRACEWELL:  Yes.  The searches I've just described

24   were conducted pursuant to judicially authorized search

25   warrants.

1          THE COURT:  You mean electronic devices.  Your plan to

2     search them, do you have a warrant to search them or would you

3     be seeking a warrant?  What's the plan?

4          MS. BRACEWELL:  Our premises warrant extended to a

5     search of the ESI, the electronic devices that we found within

6     the premises, so we have authorization to search those devices.

7          THE COURT:  Okay.

8          MS. BRACEWELL:  And in addition, we obtained

9     historical cell site data, also pursuant to a court order.  We

10    will be producing all the underlying affidavits and court

11    orders and discovery.

12         And, finally, and this is a smaller category, there

13    are various records from law enforcement databases that relate

14    to the defendant and certain relatives' whereabouts and their

15    familial relationships.

16         THE COURT:  Now, post-arrest statement, I think your

17    letter made reference to there being one.

18         MS. BRACEWELL:  Yes.  There was a post-arrest

19    interview.  The defendant made various comments and eventually

20    invoked, but we will be producing at least notes of that

21    interview.

22         THE COURT:  And before she invoked, was she advised of

23    her Miranda rights?

24         MS. BRACEWELL:  She was.  And I'm corrected now.  It

25    was also recorded, so we'll be producing a recording of the

M916BLAC                        Conference

1    post-arrest statement.

2              THE COURT:  Video or audio?

3              MS. BRACEWELL:  Video.

4              THE COURT:  You said there were communications by

5    Victim 1.  Were those by text, phone, e-mail?

6              MS. BRACEWELL:  Yes.  They were by text, and those are

7    originating from two sources.  We have both the communications

8    that we've obtained from the victim pursuant to a consent, but

9    we also obtained records of those communications through one of

10   the search warrants I described.  The defendant was using a

11   VoIP number, which means those messages that she exchanged over

12   a phone were, in fact, saved in the Google platform.  So our

13   search warrant returned various communications that she sent

14   via text message.

15             THE COURT:  All right.  Thank you.  Let me take this

16   opportunity to comply with Rule 5F of the Federal Rules of

17   Criminal Procedure.  I am reminding you of your obligations

18   under *Brady v. Maryland*, and its progeny, to disclose to

19   defense all information, whether admissible or not, that would

20   be favorable to the defendant, material either to guilt or

21   punishment, and known to the prosecution.  The prosecution must

22   make good-faith efforts to disclose such information to the

23   defense as soon as reasonably possible.  Failure to do so may

24   are result in any number of consequences, including sanctions,

25   dismissal, or vacatur of conviction in accordance with the

M916BLAC                          Conference

1    rule.  A will file a written order spelling out your

2    obligations and the consequences of failing to abide by them in

3    more detail.

4            I'll order you to make sure you read that order, and I

5    also want to confirm you understand your obligations and you

6    understand and will comply with them.

7            MS. BRACEWELL:  Yes, I understand those obligations

8    and will comply with those.

9            THE COURT:  All right.  And how long will it take you

10   to produce the discovery that you described?

11           MS. BRACEWELL:  We would ask for three weeks to

12   produce the materials I just described.  I note that we would

13   like to provide an update on our access to the electronic

14   devices.  We expect it will take sometime to have a better

15   understanding of the timeline for the FBI's forensic examiners,

16   how long they'll need to access and extract those contents.

17           THE COURT:  All right.  Very good.  So I will order

18   the government produce discovery in its possession within the

19   next three weeks on a rolling basis.  Certainly, to the extent

20   you get returns or anything afterward, you should disclose them

21   promptly.  If there are any issues with respect to delay on

22   that front, talk to one another.  If you need me, you know

23   where to find me.

24           MS. BRACEWELL:  Understood.

25           THE COURT:  All right.  Ms. Lenox, let me turn to you.

M916BLAC                        Conference

1    I think you know my practice is to set up a deadline for the

2    following defense motions.  So my question for you is, based on

3    what you've heard and know about this case, how long would it

4    take you to review discovery and prepare any motions?

5              MS. LENOX:  It sounds like discovery seems quite

6    voluminous.  We're talking about 18 different -- would you like

7    me to remove the mask, or would you prefer --

8              THE COURT:  I think our rules at this point -- I'm not

9    sure.

10             MS. LENOX:  I'm happy to leave it on.  So, I'm sorry.

11   18.  I misspoke.  12 different devices that were recovered that

12   have not yet been extracted, and there's no sense of how big

13   that extraction will be.  I would ask for 60 days.

14             THE COURT:  All right.  That seems reasonable to me.

15   So let me give you a schedule.  I have set a deadline for the

16   following:  Any defense motions by November 18.  Does that

17   suffice, Ms. Lenox?

18             MS. LENOX:  Yes, that should be fine, your Honor.

19             THE COURT:  In light of the Thanksgiving holiday, I'll

20   give the government until December 8 to file any opposition and

21   any reply by December 15.  I'll have you back in between the

22   filing of any motions and the government's opposition, not

23   because I will resolve any motions at that time; I expect you

24   to be prepared to discuss them and set a trial date, and if

25   there is a need for a hearing, a hearing as well as.  I expect

M916BLAC                    Conference

1    there will be a preliminary discussion with respect to any

2    motions at that time.

3            Now, in particular, we will be back on Tuesday,

4    November 22, at 3:30 in the afternoon.

5            MS. LENOX:  With apology, I'm teaching on Tuesdays and

6    Thursdays in the afternoons.  So if there's time in the

7    morning, I'm happy to do that.  Otherwise, I'd ask for a

8    different day.

9            THE COURT:  I'll make it Tuesday the 22nd at let's say

10   11:00 a.m.  All right?  Very good.

11           Anything else to address before we turn to the issue

12   of bail, Ms. Bracewell?

13           MS. BRACEWELL:  No.  As a matter of housekeeping, I

14   would move to exclude time until that November 22 date so we

15   can begin and hopefully complete discovery productions, so

16   defense can contemplate motions, and we can ventilate any legal

17   issues that need to be addressed.

18           THE COURT:  I'll take care of that.  Do you have any

19   objections, Ms. Lenox?

20           MS. LENOX:  No objection.

21           THE COURT:  Time is excluded under the Speedy Trial

22   Act between today and November 22, 2022.  I find the ends of

23   justice are served by excluding that time.  I find the

24   exclusion serves the interest of the defendant and the public

25   in a speedy trial to allow for the government to produce

discovery, but more importantly to allow defense counsel and

the defendant to review that discovery and consider any motions

they wish to bring and to prepare those motions and to file

them.

So let us turn to the issue of bail.  Ms. Bracewell, I

read your letter.  It's fairly comprehensive, but since it's

your appeal, is there anything you want to be heard on?

MS. BRACEWELL:  Yes.  Just briefly.  We described the

offense conduct, but I want to make sure certain details are

clear, and just for the Court's benefit.

The defendant used VoIP phone numbers, which I

referenced in the discussion of discovery materials, and she

used multiple devices.  That means she could register for phone

numbers and use phone numbers to lure her victims or potential

victims and threaten her victims without ever providing a real

name.

So she took on various identities, both in

communicating with her victims, but then at the additional

secondary step of creating and verifying the second layer of

accounts that was used in the course of the scheme.

I also want to make clear this pattern of deception,

this use of false identity is something that through the course

of our investigation we have seen was also carried out in her

daily life.  Our investigation revealed she regularly uses VoIP

numbers.  The only cell phone that comes back to her is

M916BLAC                    Conference

1    registered in her mother's name.  The IP address that was

2    coming from these catfishing accounts was in her brother's

3    name.  She appears to regularly use a rotation of electronic

4    devices.

5         We know this both from the catfishing accounts but

6    also some of her personal accounts, and I mentioned the variety

7    of electronic devices that were seized.  And to be clear, the

8    agents did not take devices from the other family members that

9    were living in this residence, so we believe that what was

10   seized belonged to or was used by the defendant.

11        She has no legal status.  And at age 34, according to

12   pretrial, she has no employment history.  What she does have

13   are job applications.  When we looked at her personal e-mail

14   accounts, that similarly set out an area that is infused with

15   fiction at various levels.  She submits applications in her own

16   names and then the alias of Viola Cohen.  They recite false

17   credentials, false employment history, false educational

18   degrees.

19        We note that we obtained additional bank records that

20   the agent was reviewing this morning that show she had a period

21   of time in bank records that she was a -- she was in

22   California, living -- we believe in connection with that

23   account she represented herself as a pediatrician.  All this is

24   to say that, in a remarkable sense, what we've seen is that

25   this defendant lived off the grid in a way that is relatively

M916BLAC                    Conference

1    unique.

2              And it's confirmed by the history that she provided to

3    pretrial services and in court yesterday, which overlooked

4    entirely a period of time where she was living in California in

5    recent history.  The pretrial report sets out she's been in the

6    New York City area since 2009.  Our investigation, including an

7    application for a driver's license but also bank records, show

8    that she was living for a substantial period of 2017 and 2018

9    in California.  She had a mailing address in two different

10   mailing addresses in California, but we've also seen withdrawal

11   activity that shows that she was regularly there and using her

12   account in retail establishments in the California area.  This

13   isn't just a mailing address that was used from a distance.

14             I say all this because what the composite picture is

15   is that she is adept at deploying false identities and

16   narratives, and that same sophistication and deception we see

17   in the defense conduct seems to have been honed over years.

18   And it's also borne out by what was found during the search,

19   the array of false identification documents, which I submitted

20   to the Court as Exhibit A.

21             To clarify our application regarding sealing for that,

22   we haven't had a chance to look into the personal identifiers

23   on those documents.  We are not sure if any of that

24   information, either the driver's license number, the name, or

25   any of the addresses belong to actual people.  We do know that

1    she has used an actual person's identity on at least one of her

2    catfishing accounts.  And so she has access to both identities

3    and false documents that look, from a completely amateur

4    perspective, believable.

5            This defendant is a tremendous flight risk.  If she

6    cuts her bracelet and flees, she has a demonstrated ability to

7    flee in a way that would frustrate detection, given her access

8    to aliases and to false documents.

9            I also just want to note that she carried out this

10   catfishing scheme from the very address where she was arrested

11   and where it's proposed she'd be released.  And while living

12   with family members who, in argument yesterday, it was claimed

13   would motivate her compliance with court-ordered restrictions.

14   All she needs to complete this offense is an Internet

15   connection.

16           And I'd also just note that one of the restrictions,

17   one of the bail conditions, was a prohibition on

18   Internet-connected or -enabled devices.  But that is

19   essentially unenforceable given that various people live in the

20   home still, other individuals live in Apartment 1 in the same

21   building, anyone, and certainly this defendant, could order a

22   phone, establish an Internet connection, as is already set up

23   in the house, and that would be enough to continue carrying out

24   these crimes.

25           I'm happy to answer any questions the Court has, but

M916BLAC                    Conference

1    in our view, the risk of flight here for this particular

2    defendant is overwhelming.

3              THE COURT:  All right.  A couple quick questions.

4    First, I confess, I overlooked your request to seal Exhibit A.

5    I think perhaps that was in an e-mail you sent to us.  My rules

6    do ask that you file such requests on ECF.  But in any event,

7    I'll grant the request temporarily.  I think you could actually

8    file it and redact all personal identifying information,

9    addresses, date of birth, social security numbers, even names,

10   to the extent you're not yet in a position to know whether

11   those are real people or not, just so it's public record and

12   there were some pictures that I think you were not able to

13   identify as the defendant's pictures, redact those out of an

14   abundance of caution.  But I think the document should be

15   public, to the extent possible.  Why don't you do that

16   promptly.  In the event you conclude anything should be

17   unsealed, you should modify the order.

18             MS. BRACEWELL:  Absolutely.  We'll file that after

19   today's proceeding.

20             THE COURT:  Second, you mentioned that the defendant

21   had applied for a driver's license and bank accounts or had

22   bank accounts in California.  Can you elaborate on that?  Is

23   that in her true name?

24             MS. BRACEWELL:  Yes.  So in addition to the California

25   driver's license that was recovered in a different name, what

1    we found was there was an application made in approximately the

2    summer of 2017 from a Los Angeles address -- providing a

3    Los Angeles mailing address.  There were followup on that

4    application.  And approximately October of 2017, the bank

5    records that I alluded to are from 2017 into 2018, and, again,

6    show her name, Sequoia Blackwood, and show presence and

7    activities in Los Angeles.

8            THE COURT:  Thank you, Ms. Lenox.

9            MS. LENOX:  Thank you, your Honor.  We agree with the

10   assessment of pretrial services and Judge Willis that there are

11   conditions that can be set that would reasonably assure

12   Ms. Blackwood's return to court.

13           I wanted to start by addressing the argument that the

14   government has made that there are inconsistencies in the

15   pretrial report that indicate Ms. Blackwood's lack of damage

16   report.

17           I was present for the pretrial services interview, and

18   I took notes as I normally do.  Ms. Blackwood disclosed to

19   pretrial when they asked about where she lived.  She lived in

20   New York from 2002 until 2008, then she left New York and moved

21   to California where she lived from 2008 until 2018, and then

22   returned to New York in 2018 after her father's passing, and

23   has been living at the same address with her mother, her

24   brother, and her now 12-year-old daughter, where she has

25   resided for the past four years.

M916BLAC                    Conference

1          THE COURT:  Let me interrupt for a second, because the

2     pretrial services report, which I did review as well, I think

3     indicates that she has lived at the same address for ten years.

4     Is that a mistake?

5          MS. LENOX:  That's incorrect, and that's not the

6     information she provided to the pretrial.  So I can't speak to

7     why that is represented in that way.  But I do have and

8     reviewed after yesterday's proceedings my notes from the

9     pretrial interview, and I have the actual timeframes written

10    down.  And they align directly with what Ms. Blackwood told me

11    directly when I was interviewing her separately, so I don't

12    know what the confusion is in the pretrial report and why it

13    reflects that.  But I will say that I know that she was candid

14    about that to pretrial because I was there.

15          THE COURT:  Okay.

16          MS. LENOX:  I also want to take a moment to address

17    the government's argument that Ms. Blackwood was not

18    forthcoming to pretrial or was not forthcoming generally about

19    the reason that she returned to New York.

20          So the government argued yesterday that, at some point

21    during the arrest process, Ms. Blackwood told law enforcement

22    that she moved back to New York because -- or she moved away

23    from New York because of famishes.  And I represented to the

24    Court that she had moved from New York, in part, because she

25    was a domestic violence victim.  Those two statements are not

M916BLAC                    Conference

1    incompatible.  Those two things together, they can both be

2    true.  And it makes sense why Ms. Blackwood wouldn't disclose

3    to law enforcement, who had just executed her arrest, her

4    personal family history.

5            I also want to take a moment to address the

6    government's assertion that Ms. Blackwood told pretrial that

7    she earned an income through various banks.  Right?  So they

8    say she's unemployed, does not have strong community ties, but

9    she has reported to pretrial, and as reflected in the financial

10   affidavit, several thousand dollars in a bank account.

11           The government is insinuating in their argument that

12   she earned this money unlawfully and that she didn't disclose

13   to pretrial the source of that income.  The second page of the

14   pretrial report makes it clear that she told them, as reflected

15   in my notes from the interview, because I was there, that that

16   money, the source of that money, is from her child's father.

17   It is her savings because he sends her money for child support.

18   There aren't actual inconsistencies between what Ms. Blackwood

19   disclosed to pretrial and what the government knows to be true.

20           THE COURT:  Okay.  Can I interrupt again just on that

21   score?  The government also makes reference to the Brooklyn

22   address that was on the New York City identification.

23           MS. LENOX:  I'm getting to that, your Honor.

24           THE COURT:  Okay.

25           MS. LENOX:  So the government's argument with respect

M916BLAC                        Conference

1    to that, it's the New York City identification card that's on

2    Government Exhibit A.  That is a New York City identification

3    card that Ms. Blackwood obtained at a library in Brooklyn in

4    2018 when she returned to New York.  The address on that

5    identification card, which I Googled, is an address for a

6    postal service, like a postal mailbox.  So it effectively is

7    one of these packaging/printing places that rents out

8    mailboxes.  It is not actually a residence.

9            The reason that Ms. Blackwood didn't disclose that she

10   lived there is because she never has.  It's not a residential

11   facility.  It is a place where Ms. Blackwood received mail, and

12   she used that address to receive mail at a certain point in

13   time.  That is, again, related to the DV.  And while it may

14   seem odd to you and to me and to the government, folks who are

15   victims of intimate partner violence, folks who are threatened

16   by individuals, who say they will come after them, often make a

17   lot of attempts to conceal their identities and to get

18   mailboxes that are separate and apart from their homes where

19   they can receive confidential mail, from places like advocacy

20   organization, which Ms. Blackwood did consult with.

21           That goes to the government's next point that the fact

22   that Ms. Blackwood doesn't have legal status is cause for

23   concern.

24           THE COURT:  Before you move on to that.

25           MS. LENOX:  Yes.

M916BLAC                    Conference

1        THE COURT:  I don't doubt that that is common with

2   victims of intimate partner violence.  It seems a little odd to

3   have such an address in Brooklyn when she's residing in the

4   Bronx.  One would think of a location closer to her residence

5   where she could get her mail that would be similarly near where

6   she's living.  So it seems a little bit odd there would be a

7   Brooklyn address and it's not at an all actual residence.

8        MS. LENOX:  Well, the fact it isn't a residential

9   address doesn't change -- it rebuts the government's argument

10  that there's an address where she lived that she didn't report

11  to pretrial.  It is in Brooklyn.  Brooklyn is not near the

12  Bronx.  Ms. Blackwood has family in New York City, most of them

13  live in the Bronx.  She does have a sister who lives in

14  Brooklyn.  If she's trying to be in an area that is unknown to

15  her abuser, it might be that it makes more sense to get mail in

16  Brooklyn, I'm speculating.

17        THE COURT:  Okay.  Go on.

18        MS. LENOX:  With respect to her legal status,

19  Ms. Blackwood came here in 2002.  She has remained in the

20  United States for that entire time.  So she has not returned to

21  Jamaica; she has not left the country in the last 20 years.

22        Over the past couple of years, after leaving the

23  advocacy organizations for folks who are victims of domestic

24  violence, she was referred to an attorney to help her pro bono

25  with her legal status.  She recently got work authorization

M916BLAC                    Conference

with the help of this attorney, and she is currently in the

process, or was, before her arrest, securing a green card.  So

this is not a person who has strong ties outside of the

United States.

          In fact, as I told the Court yesterday, the vast

majority of Ms. Blackwood's family, not just her mother and

brother and daughter with whom she lives, but aunts, cousins,

her sister, all of whom I have communicated with in the last

18 hours, they all live in the New York City area; many of them

live in the Bronx.  Ms. Blackwood doesn't actually have any

family that she has a relationship with in Jamaica.  Certainly,

she has no ties there, and there's no reason to believe that

that is a place where she would evade, and the government has

already seized her passport.

          The government has raised that Ms. Blackwood poses a

risk of flight because she doesn't have community ties, and,

specifically, that her family didn't know about the allegations

against her, didn't know that she was allegedly engaged in this

behavior, and so they can't prevent her from continuing to do

so if she's released.  That's a strong argument, your Honor.

More often than not, family members of our clients don't know a

lot of what they are accused of having done before they are

actually charged.  Most of the calls to family members that we

notify clients are arrested are received by people who are

shocked, and this is not surprising.

1          THE COURT:  I think your argument here is that she

2     lives with them, so either she was able to do all these things,

3     including receiving mail in other people's names and so on and

4     so forth, without anyone noticing, that she was living with,

5     seems hard to believe, or they noticed and didn't care, and

6     that suggests a lack of moral suasion over her.  And to the

7     extent you're relying on her contact and relations with them

8     for moral suasion to avoid from reoffending or fleeing, then

9     that speaks to that.  I think that's what I understand the

10    government's argument to be.

11         MS. LENOX:  I think if people are allegedly committing

12    certain acts on electronic devices, it's really easy not to

13    know what they're actually doing.

14         THE COURT:  But she was getting mail in someone's

15    name, according to the government.

16         MS. LENOX:  According to the government.

17         THE COURT:  Okay.

18         MS. LENOX:  But, again, I don't think it's surprising

19    that her family wouldn't know.  I don't know who is doing what

20    in my home on their personal devices.  But I do think that if

21    released on bond that is signed by members of her family in an

22    amount of money that would cripple them if she were not to

23    comply with conditions of her release, I do think that's

24    significant, your Honor.

25         The government is arguing that Ms. Blackwood has all

M916BLAC                    Conference

1    of this technical savvy, this acumen that allows her to create

2    different personas.  But what I hear them alleging is

3    essentially that Ms. Blackwood used or made up some fake names

4    on the Internet to create fake profiles, which is not a

5    particularly -- this does not require any particular technical

6    savvy.  Law enforcement does it all the time to insnare child

7    sex offenders, and certainly there are people who use aliases

8    all the time.  I think on Instagram, it is known as a finsta,

9    fake Instagram, where people will put in names of other folks

10   to use an Instagram account and see other Instagram accounts

11   without letting them know it's them individually doing it.

12   It's not difficult and doesn't require technical savvy.

13           The government learned of all the identities that

14   Ms. Blackwood was reporting to me through an IP address that

15   was assigned to her's residence.  If Ms. Blackwood was actually

16   technically savvy, she would do what other of my clients do,

17   which is using a self-running operating system that you can

18   store on a USB, plug it into the computer.  It's called Tails,

19   and then run it on the Tor network, which is designed to evade

20   detection.

21           So there are actually folks who are technically savvy

22   and capable of trying to evade law enforcement detection and

23   who use these technically savvy instruments to avoid detection,

24   things like the dark web.  None of that is what is being

25   alleged here.  It was easy for the government to identify

1    Ms. Blackwood, as they say, as the perpetrator, as they claim,

2    in large part because she didn't actually do a very good job

3    based on what the government is representing of concealing her

4    identity.

5         I also want to note, because I think it's really

6    important, I understand the government's arguments with respect

7    to the different ways in which Ms. Blackwood has put herself

8    out to be someone else.  But there are many, many cases, many

9    complicated wire fraud cases, that extend over a period of

10   years where people go undetected, they steal millions of

11   dollars from other individuals, and different companies or

12   entities by assuming aliases, using various forms of fraud,

13   engaging in fraudulent behavior.  They conceal what they are

14   doing, and they go undetected.  And in these cases, many of

15   those people, like Ms. Blackwood, have no criminal record.  And

16   in these cases, most of my clients who are charged in cases

17   like these, where the scheme is actually quite complex, where

18   it's something that is much more difficult to do than

19   catfishing, the government contents to bond.

20        I think in a case like this, with a person who has

21   strong connections to New York, a young daughter who she is a

22   single parent to, family with whom she lives, and other family

23   in the surrounding area, who has absolutely no record of any

24   allegations of any criminal conduct whatsoever against her, I

25   think it's quite clear that there are conditions that can be

1   set, and they can be strict conditions that would ensure her

2   return to court.

3        I'm happy to answer more questions, but that is my

4   plea to your Honor.

5        THE COURT:  All right.  Just one question.  With

6   respect to Jamaica and Ms. Blackwood's immigration status, I

7   heard your argument that she didn't have ties to Jamaica.  Am I

8   correct she would almost certainly be deported from the

9   United States to Jamaica or elsewhere?

10        MS. LENOX:  I do believe that's correct.

11        THE COURT:  All right.  So as you know, my review is

12   *de nova*.  That is to say there's no deference given to the

13   magistrate judge's order of release or detention under

14   Section 3142.  The question for me is whether there's any

15   condition or combination of conditions that will reasonably

16   assure the appearance of the defendant as required and the

17   safety of any other person in the community at all times.  The

18   government maintains the ultimate burden of persuasion.  But

19   the standard of the preponderance of the evidence that the

20   defendant presents a risk of flight, there's no argument being

21   made here with respect to danger to the community.

22        The factors that I must consider in making that

23   determination are set forth in Section 3142(g).  They include

24   the nature and circumstances of the offense, the weight of the

25   evidence, the history and characteristics of the person, and

1   the nature of the seriousness as applied here.  I guess that

2   doesn't apply.

3             Now, in light of those factors in the record here, I

4   think there's an overwhelming case for detention.  There's

5   certainly well more than the preponderance of the evidence.

6   There are no combination of conditions that could be set forth

7   that would assure Ms. Blackwood's appearance, largely stated in

8   the government's letter.

9             Now, I'm not going to put any weight on the alleged

10  misstatements to pretrial since it sounds like there are some

11  discrepancies on that front.  But even in the absence of that,

12  the incentive to flee is overwhelming, given the certain

13  removal from the United States in the event of conviction, the

14  weight of the evidence is strong, which relates to that

15  incentive, and defendant has demonstrated an ability for

16  Ms. Blackwood to obtain and facilitate false identifications

17  and records, and demonstrates not only a willingness, but an

18  ability to obtain the information she would need to obtain to

19  flee.  And I think living with her family would not suffice

20  given the reasons that I stated earlier.

21            So bottom line is, certainly, I think the government

22  has demonstrated by a preponderance, which is what the standard

23  is, that detention is appropriate here.  So I'll order the

24  defendant be detained pending trial.

25            Anything else from the government?

M916BLAC                          Conference

 1             MS. BRACEWELL:  No thank you, your Honor.

 2             THE COURT:  Ms. Lenox, anything else from you?

 3             MS. LENOX:  No.

 4             THE COURT:  All right.  After this, we'll adjourn in a

 5    moment.  Ms. Bracewell, can I see you about something totally

 6    unrelated to this case?  With that, we're adjourned.

 7             (Adjourned)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25